[993 NYS2d 869]

R.B., Petitioner, v K.G., Respondent.

Family Court, New York County, September 5, 2014

**APPEARANCES OF COUNSEL**

*Eilish M. McLoughlin* for petitioner.
*Richard Abrams* for respondent.
*Anna Schissel*, Attorney for the Children.

**OPINION OF THE COURT**

DOUGLAS E. HOFFMAN, J.

Following fact-finding in these petitions filed pursuant to the Hague Convention, the court sets forth its findings of fact and conclusions of law.

## The Parties

Petitioner father R.B. filed the instant petitions in early 2014, asserting that respondent mother K.G. wrongfully retained the subject children, M.B. (13) and G.B. (10), in the United States and that they should be returned to Israel, their country of habitual residence. The parents were born and raised in Israel. They married on March XX, 1999. Their two children were born in Israel and lived there for their entire lives until August 4-5, 2012, when the mother brought them to the United States. The parents and children lived in Israel together as a family until just prior to their divorce in 2007. Following separation, the father moved nearby and saw the children regularly. Shortly thereafter, the parents' extensive negotiations, with the assistance of a professional mediator, culminated in a detailed August 12, 2007 divorce agreement that was incorporated, but not merged, into a September 2007 judgment of divorce from a Family Court in Haifa, Israel.

## Procedural Background

The parties' mediated August 12, 2007 property relations and divorce agreement (agreement) has significant ramifications for the instant proceedings. The mother was an attorney with 15 years of litigation experience, managing her own private practice in Israel. The father is not an attorney. Both parties engaged attorneys to represent them in mediation and the divorce proceedings in Israel. The parties participated in numerous discussions, including several sessions with a professional mediator in Israel. The agreement was comprehensive and addressed in detail is-

sues concerning parenting the children, child support and other financial issues.

The agreement stipulated that Ms. G. would have primary residential custody of the children and that both parents "will be guardians to the Children" within the meaning of Israeli custody law. The agreement provided that "[a]ny matter of substance relating to the fate of the Children shall be subject to consultation between both parents who will reach a joint decision on the matter," and that "every dispute shall be settled by way of negotiations, in the absence of the Children and by way of a settlement agreement, to the extent possible." If no settlement is reached, paragraph 8.5 of the agreement states that "authority to settle the disputes is granted solely to the Haifa Family Court."

Very importantly, section 3.5 states:

> "The Minors shall not leave Israel except upon the joint consent of the Husband and Wife. Notwithstanding the above, the Husband and Wife shall not withhold approval of the Minor's exiting the country where it is required for a trip abroad with the Husband or the Wife or any of their relatives or friends, for a period of up to 1.5 months."

Section 3.6 stipulates that any party violating section 3.5 is liable for costs, attorney's fees and other expenses incurred by the aggrieved party. Section 4 of the agreement specifies the father's parenting time, including overnights, with half of holidays, school recesses and summers with each parent.

Both parties testified that, following the divorce, the father fully exercised his parenting and custodial rights in Israel. The children were closely bonded to each parent.

### Removal of the Children to the United States

According to the mother's testimony, she developed an intent in or about December 2011 to spend at least a year in the United States with the children. She notified the father that she wished to do so, stating that she wished to study in the United States and that the children would have the opportunity to learn English. Mr. B. informed Ms. G. of his opposition to this plan. Pursuant to the divorce agreement, the parties entered into mediation, with both parents receiving assistance of counsel.

Over a period of several months, the parties attempted to hammer out an agreement through mediation. Ultimately, the father agreed to permit the children to accompany the mother

to the United States for the one-year period of August 2012 to August 2013 provided that the mother agree to certain conditions. The father's most recent proposed written agreement (petitioner's exhibit 5) was designated as an addendum to the 2007 Property Relations and Divorce Agreement. It contained certain key terms, including a predicate statement that the mother wished to travel to the United States to study for one year, accompanied by the children. The proposed agreement, dated June 2012, focused on temporary modifications of child support in section B and visitation arrangements in section C. The proposed agreement anticipated that the father would visit the children in the United States and that he would have the children with him the entire time, subject to their school schedule.

Section D of the father's proposed agreement states in bold and underlined print, with larger font: "The parties agree and undertake that the Minors may leave the country **temporarily and not for the purpose of permanent residence**, starting August 2012 until August 2013, **during which they will continue to be Israel citizens and residents**." Paragraph D.6 of the proposed agreement stipulates that the mother shall return the children to Israel no later than August 3, 2013, "where, failure to do so shall be considered kidnaping under the Hague Convention, *unless the Parties agree otherwise in writing*."

Paragraphs 7 and 8 of the document state that to guarantee the children's return to Israel, the father shall have a lien for 30% of the mother's residential apartment in Israel and that if the children are not timely returned to Israel, the father may execute upon the lien and recover all related costs and fees of having the children return. Paragraph 9 of the proposed agreement expressly states that the father's consent to the children's departure from Israel is based solely on their return by the designated date and that the children's permanent address shall be Israel.

Paragraph 13 of the document provides that any extension of the return date of the children to Israel can be granted only upon prior written consent by the father, which would then be submitted to the Haifa Family Court. Paragraph 15 stipulated that the cost of the father's airfare to the United States would be deducted from his child support obligations. Paragraph 17 states, "**The Parties agree that the Haifa Family Court is the sole and unique authority for deliberating on mat-**

**ters relating to the Minors, including failure to return them to Israel on the date stipulated above.**"

The parties never signed the agreement. Both parties testified that the mother made certain proposed modifications that are indicated in petitioner's exhibit 5. Those proposed modifications focused primarily upon the financial issues set forth in the document, including elimination of liens, costs, fees and changes in child support. As is discussed, infra, the mother crossed out paragraph 16 of the proposed agreement, which provided that the mother pay the cost of the children's tickets to Israel if they came to visit. The mother's written notation was that she did not intend for the children to visit in Israel and that the children's visa would not allow them to travel to Israel without her, so that this paragraph was irrelevant. This contradicts the mother's in-court testimony that she had intended for the children to stay in the United States indefinitely, but visit the father from time to time.

The parties never executed petitioner's exhibit 5. The testimony is not clear from either party as to the precise reason, but it appears that the parties could not agree on financial issues. The father testified that, ultimately, he did not want to interfere with the children's chance to spend a year in the United States and to learn English, and that he clearly understood that, even if not all of the financial arrangements were fixed, the children would in any case be returning within one year and that the mother would pay for his round-trip airfare to visit the children in the United States. As discussed, infra, the court found the father to be a truthful, very straightforward witness whose testimony the court credited.

On August 4-5, 2012, the mother flew to New York with the children.

### The Children in New York

Ms. G. has not returned the children to Israel. The mother testified that the children are now well established, very happy and thriving in New York City and that she and the children wish to remain here. Respondent suggests that Mr. B. can visit the children liberally in New York and that the children can visit him in Israel as or if their visa permits. Both parents testified that the children are doing well in New York, performing well in school, learning English, making friends and engaging in meaningful extracurricular activities that they enjoy.

The court conducted an in camera interview with each child pursuant to *Matter of Lincoln v Lincoln* (24 NY2d 270 [1969]),

in the presence of the children's attorney. All counsel were afforded the opportunity to submit suggested questions for each child prior to the in camera interviews. As discussed further below, the interviews were primarily confirmative in nature. The court had the pleasure to meet each child and discuss with them their lives in the United States and in Israel. The children appeared to speak freely and openly. It is clear that the children love both of their parents, are doing very well here and would *prefer* to remain in the United States at this time.

Ms. G. became a visiting fellow at Columbia University School of Law. This status permitted her to stay in the United States and allowed her to take classes at Columbia. It is not a degree program. She did not and does not work at or for Columbia, but is in essence a student there. The children's visa permits them to remain in the United States for as long as their mother retains her visa, which must be renewed periodically.

Ms. G. asserts that it is in the best interest of the children to remain in the United States. The children's attorney supports her clients' wishes. Mr. B. contends that it is not best for the children to remain in the United States, and that their retention here violates his rights as a father and deprives him and the children of the benefits of the close relationship they enjoyed in Israel in violation of his and their rights.

### Father's Attempts to Have the Children Returned to Israel

The children's time in New York started uneventfully from a legal perspective. The father maintained regular contact with the children, by telephone and via Facetime, as well as through letters and packages. He tried to speak with the children about three times per week through telephone or Facetime, although he was not always successful. During these calls, he would discuss with the children their daily routines, activities in school, what they were feeling or going through and generally tried to be a part of their lives, despite the practical difficulties. He visited the children in New York in October 2012, with the mother paying for his round-trip airfare. The father stayed overnight at the mother's home in New York.

The father visited the children again in March 2013, staying with his new partner at a hotel in New York. The mother again paid for his round-trip airfare. Mr. B. took the children on a trip to Baltimore and spent time with the children in New York, to the extent that the children's school schedule permitted.

During the spring 2013 visit, the mother raised for the first time the issue of having the children stay in New York for an-

other year. The father adamantly opposed any extension. The parties communicated further by both telephone and email. As indicated in petitioner's exhibit 7, Mr. B. sent an email to Ms. G. on April 4, 2013 stating, "I'm beginning to hear rumors that you are staying in New York for another year. I don't know how the rumors get around but they do. What's up with that?" On April 6, 2013, the mother responded via email, stating in pertinent part, "As I explained to you, I have no idea what's the source of the rumors. However, after discussing the matter with you, I have decided to try to extend our stay here for another year considering, among other things, the children's wishes and their best interest." Ms. G. proposed that the children stay in Israel during the summer vacation, from mid-July to mid-August 2013. She again offered to finance the father's airfare to visit the children in November or December 2013 and that, assuming that the father arrive alone, offered to let the father stay in her apartment during the visit. Ms. G. concluded by stating, "[w]e will return to live in Israel in July 2014. Awaiting your response ASAP."

The father made clear his opposition to the children remaining in the United States. By email dated April 28, 2013, Mr. B. told Ms. G.,

> "As I have already mentioned in our telephone conversations and in the short discussion we had at your place in New York, I agreed that the children would join you in New York for one year only. We were supposed to sign an agreement that states it but we did not, yet in fact we have been abiding by this agreement without signing it."

With respect to the possibility of the children remaining in the United States for another year, the father added,

> "It means that my right to fatherhood has been taken away from me, it means that I am unable to hug my children (our children), it means that my children (our children) are unable to get a hug from me, it means that my right to be a significant parent in my children's life (as I was until the day you all left) is being taken away from me for this period of time, it means that during a significant period of their development my children are not next to their father. All this for the sake of your career . . .
>
> "A year ago you made a verbal promise that you were going for just one year . . . As stated, the circumstances have changed. How can I rely on your

promise that you will all return to live in Israel in July 2014?

"I don't wish to get dragged through various courts to fight for my rights and the rights of our children to have a significant father-child relationship. Therefore I am not negotiating and not bargaining now because, as far as I see it, this is an issue that cannot be subjected to pricing or bargaining. After many deliberations, consultations and thoughts, I'm willing to let the children stay with you in New York for another year, subject to the following provisions:

"a. You will sign the agreement that was not signed last year and it will be approved by the court when all of you visit Israel.

"b. Your signature that all of you will return to Israel in July 2014 at any cost!! Without changes in circumstances or other developments of any kind.

"c. A bank guarantee of 500,000 NIS or a deposit of said amount in trust to guarantee the children's return to Israel in July 2014.

"d. You will pay for two airline tickets for me during the year to visit the children.

"e. The children will come to Israel for the summer vacation in August 2013 and for the spring break in March/April 2014, financed by you. The children may stay with me during that visit.

"f. You will finance half of my stay (hotel/rent) during my visit in New York. Our relationship permitting, I may stay in the apartment with the children."

In her responsive email the following day, Ms. G. reiterated that she wanted to stay for another year and that her objection to the agreement was financial, not temporal, in nature. Ms. G. stated in pertinent part, "I am sorry but your demands are unreasonable and unbalanced and I do not believe that I am exposed to such financial sanctions, assuming that the court will be asked to determine the balance." Apparently referring to the father's draft of the original agreement in June 2012 and the mother's written comments thereto, Ms. G. continued,

"[t]he agreement has not been formulated because to this very day you have not responded to my email with my comments to the draft that you sent in. Actually, despite the fact that I was not supposed to do so, I financed an airline ticket and one visit stay,

while the agreement talked about the flight only."

Denying that her career motivated the change in return date, the mother noted that she had been unemployed since August. She added,

"[a]s I explained to you as well as did the children in the conversation you initiated with them, we all feel that it would be better to stay for another year and reap the fruits of the efforts everyone invested in learning the language, acquiring friends and in getting acclimated in general . . . I will consult my attorney as to our further steps."

Discussion between the parents continued. On June 28, 2013, Mr. B. emailed Ms. G. as follows:

"Pursuant to our telephone conversation and the email you sent me, I hereby inform you that I am not willing to let the children stay in New York for another year. I am asking you to honor our agreement, according to which it would be a one-year stay ending in August 2013."

In what appears to be a carefully worded email from a legal perspective, Ms. G. responded by email on July 2, 2013, expressing shock and appall that Mr. B. would retract his prior indication to her and to the children of no objection to their staying in New York for another year, citing the benefits to the children.

Mr. B. did not consent and retained present counsel in New York. Counsel wrote to the mother on July 24, 2013 reiterating the father's position that he agreed to only a one-year stay in New York, from 2012-2013, citing the draft agreement between the parties. The father's attorney demanded the children's immediate return to Israel, unless the mother signed the father's proposed agreement set forth in his April 28, 2013 email. The attorney concluded by stating that if she did not hear from Ms. G. by the end of the week, the attorney would file a Hague Convention petition.

Ms. G. did not respond to the email. During her testimony, she stated without foundation that she felt that the father had agreed to the second year based primarily upon his conversation with M.B., then 11 years of age.

In January 2014, the father, through counsel, filed a request for this court to register the Israeli divorce/custody order in New York and to enforce that order by directing the mother to return the children home to Israel. (*See* Domestic Relations Law § 77-d.) On February 11, 2014, the mother, through counsel,

filed an objection to the registration of the out-of-state custody order (*see* Family Ct Act § 580-607), asserting that the August 12, 2007 agreement had been renegotiated and modified by the parties and that she had performed under the modified agreement. For the reasons set forth on the record on February 13, 2014, the court held that the mother had not proffered any basis pursuant to statute to object to the registration of the order and that it was therefore proper to register the Israeli order.

Following the registration of the Israeli order, Mr. B.'s counsel re-filed the instant petition on March 3, 2014, seeking enforcement of the Israeli custody order and the return of the children to Israel, based in part upon the requirements of the Hague Convention, discussed below. Counsel for Ms. G. received a consent adjournment of the April 3, 2014 return date based upon a valid personal reason and the court rescheduled the matter for May 8, 2014.

On May 5, 2014, the mother, through counsel, filed an answer and cross petition seeking to "enforce and modify an order and for contempt of court." In the verified document, the mother specifically stated that the parties modified the 2007 Israeli order in 2012 and again in 2013. Ms. G. averred that the parties agreed in 2012 that the children would join her in New York "through the summer of 2013" and in 2013 that the children would remain in New York "through the summer of 2014." Citing the children's new roots and opportunities in New York, Ms. G. contended that their best interest lay in remaining in New York. The mother also asserted that the father's relationship with the children would suffer irreversible damage if the children were returned to Israel as they would know that the father petitioned to have them forced to leave New York against their wishes. The mother asked this court to modify the Israeli custody order to permit the mother permanently to relocate to New York with the children and for other relief. The court raised the jurisdictional issues attendant to Ms. G.'s cross petition and afforded the opportunity for the parties to address that issue.

On June 11, 2014, the court on its own motion dismissed the mother's cross petition for lack of jurisdiction for the reasons stated on the record, citing, inter alia, Domestic Relations Law § 76-b. The balance of the petitions were scheduled for June 30, 2014. The mother indicated that she retained new counsel. On June 30, 2014, the mother asked for a further adjournment so that she could retain new counsel, as the anticipated new counsel did not work out. Over petitioner's objection, the court

adjourned the hearings until August 5, 2014 for a final pretrial conference, marked final against respondent. The trial commenced August 6, 2014 and continued on August 12th. The court conducted the two in camera interviews on August 18, 2014. The parties submitted posttrial memoranda and this decision/order follows.

## Applicable Standards

The Hague Convention on the Civil Aspects of International Child Abduction (1343 UNTS 89, TIAS No. 11670 [1980], reprinted in 51 Fed Reg 10494 [1986]) (Hague Convention or Convention) was designed " 'to protect children internationally from the harmful effects of their wrongful removal or retention and to establish procedures to ensure their prompt return to the State of their habitual residence, as well as to secure protection for rights of access.' " (*Gitter v Gitter*, 396 F3d 124, 129 [2d Cir 2005], quoting Hague Convention, Preamble, 51 Fed Reg at 10498.) The drafters of the Convention "were particularly concerned by the practice in which a family member would remove a child to jurisdictions more favorable to his or her custody claims in order to obtain a right of custody from the authorities of the country to which the child had been taken." (*Mota v Castillo*, 692 F3d 108, 112 [2d Cir 2012].) To remedy such a situation, the Convention provides for the "prompt return of children wrongfully removed to or retained in any Contracting State." (Hague Convention, ch 1, art 1, 51 Fed Reg at 10498.) The Convention focuses not on resolving any particular custody dispute, which emphasizes the best interest of a child, such as whether or not a parent may relocate with a child, but rather whether or not a child should be returned to his or her country of habitual residence where any custody dispute may properly be resolved. (22 USC § 9001 [former 42 USC § 11601] [b] [4]; *Mota*.)

In 1988, Congress passed the International Child Abduction Remedies Act (ICARA) to "establish procedures for the implementation of the Convention in the United States." (22 USC § 9001 [former 42 USC § 11601] [b] [1].) ICARA provides that a person seeking to initiate judicial proceedings under the Convention may do so by commencing a civil action or proceeding in federal or state court, "in the place where the child is located at the time the petition is filed." (*Id.* § 9003 [former 42 USC § 11603] [b].) To prevail, a petitioner must establish by a preponderance of the evidence that "the child has been wrong-

fully removed or retained within the meaning of the Convention" (*id.* § 9003 [e] [1] [A]). To determine whether or not the removal or retention was wrongful, the trial court must determine whether or not the removal or retention breached petitioner's custody rights under the law of the state in which the child was habitually resident immediately before the removal or retention. If so, then the trial court has to determine whether or not the petitioner was exercising his custody rights at the time of the removal or retention, or would have been exercising those rights but for the removal or retention. (Hague Convention, ch 1, art 3.)

Neither the Hague Convention nor ICARA defines "habitual residence." The determination as to habitual residence is fact-intensive and depends upon the most recent "settled intent" shared by those entitled to fix the children's residence, here their parents. (*Gitter,* 396 F3d at 131-132.) The focus is on the latest time the parents shared an intent. (*Id.* at 133; *see also Hofmann v Sender,* 716 F3d 282, 291-292 [2d Cir 2013].) In making this determination, courts review the actions and declarations of the parents, as that normally controls the habitual residence of the children. (*Id.* at 291.) In situations in which a parent did not file a Hague Convention petition until more than one year elapsed from a wrongful removal or retention, courts look at a second prong concerning habitual residence, whether the evidence "unequivocally points to the conclusion that the child has acclimatized to the new location and thus has acquired a new habitual residence, notwithstanding any conflict with the parents' last shared intent." (*Id.* at 293-294, citing *Gitter* at 134.) "[W]here the child's initial translocation from an established habitual residence was clearly intended to be of a specific, delimited period," courts decline to find that the changed intention of one parent alters the child's habitual residence. (*Mozes v Mozes,* 239 F3d 1067, 1077 [9th Cir 2001].) In any case, as this court finds that the father has timely filed his petitions, the court need not review the second prong of the habitual residence test. (*See infra.*)

Even if a petitioner establishes a wrongful removal or retention, the court *may* dismiss the petition if the respondent establishes by a preponderance of the evidence one or more exceptions to a return order set forth, as relevant here, in articles 12 and 13 of the Convention. (*See* 22 USC § 9003 [former 42 USC § 11603] [e] [2].) In the instant proceeding, respondent and the attorney for the children assert that if the court

finds that there is a wrongful retention or removal, respondent has established by a preponderance of the evidence the defense that more than one year has elapsed between the wrongful removal or retention and the date of the filing of the petition (*id.* § 9003 [e]), *and* she demonstrated that the children are "now settled in [their] new environment," New York. (Hague Convention, ch 3, art 12.)

In determining whether or not the children are well-settled in New York, the court must focus upon whether there is "substantial evidence of the child's significant connections to the new country." (Public Notice 957, *Hague International Child Abduction Convention; Text and Legal Analysis*, 51 Fed Reg 10494, 10509 [Mar. 26, 1986].) Courts have considered factors such as the children's ages; the stability of their new residence; consistency of school attendance; stability of parent's employment or other means of support; immigration status of the parent or children; the children's relationships in the new residence; and the children's ties to their country of habitual residence. This list of factors is not exhaustive. The focus is upon whether there came a point at which the children became so settled in their new environment that repatriation may not be in their best interest. (*Blondin v Dubois*, 238 F3d 153, 164 [2d Cir 2001].)

Alternatively, both Ms. G. and the attorney for the children proffer a second defense or exception to a return order: that the children "object" to being returned to Israel and that the children have "attained an age and degree of maturity at which it is appropriate to take account of [their] views." (Hague Convention, ch 3, art 13.) This is the primary reason why the court conducted in camera interviews with each subject child, in addition to considering the evidence adduced at trial. To establish this defense, the court takes note that there is no bright line as to the age of the child and that this determination must be made on a case-by-case basis. (*de Silva v Pitts*, 481 F3d 1279, 1286 [10th Cir 2007].) The court must also consider whether there has been undue influence upon the children. (*Hague International Child Abduction Convention; Text and Legal Analysis*, 51 Fed Reg 10494.) The court finds no undue influence in the instant proceeding, as the court was satisfied based upon the trial evidence and upon its interviews with the children that the children spoke freely and were able to articulate the basis for their preferences. This court also looked to the reasons for the children's wishes or preferences, not just to the age and level of maturity of the children.

Given the purposes of the Hague Convention and its corresponding legislation in the United States, this court must narrowly construe any such defenses or exceptions to a return order. (22 USC § 9001 [former 42 USC § 11601] [a] [4].) In fact, even if respondent establishes her defense or defenses, the court has the discretion to order the children's return to Israel. (*Haimdas v Haimdas*, 720 F Supp 2d 183, 204 [ED NY 2010].) While the court may take into consideration the views of the children, it is not required to accede to them. (*Gitter*; *Haimdas*.) As noted, the key purpose of the Convention was to return children who have been wrongfully removed or retained. With respect to the "wishes of the children" defense, courts have held that they should apply a stricter standard when the children's wishes are the sole basis supporting a repatriation determination. (*Tsai-Yi Yang v Fu-Chiang Tsui*, 499 F3d 259, 280 [3d Cir 2007].)

If the petitioner prevails in a return proceeding brought pursuant to this section, the court ordinarily must "order the return of the child forthwith." (Hague Convention, ch 3, art 12.) Mr. B. seeks an award of costs and legal fees associated with this proceeding. Pursuant to Hague Convention, chapter 5, article 26, a successful petitioner shall be awarded "necessary expenses," including attorney's fees. 22 USC § 9007 (former 42 USC § 11607) (b) (3) shifts the burden onto an unsuccessful respondent in a return proceeding to demonstrate why an award of necessary expenses would be "clearly inappropriate." A prevailing petitioner is presumptively entitled to necessary costs, subject to the equitable discretion of the trial court. The trial court should utilize the same general standards that apply when "attorney's fees are to be awarded to prevailing parties only as a matter of the court's discretion." (*Fogerty v Fantasy, Inc.*, 510 US 517, 534 [1994].)

## Discussion

In light of these standards, the court turns now to the trial evidence. The credible evidence establishes the following: Mr. B. has established a prima facie case of wrongful retention of the subject children. Although the parties did not actually sign the agreement permitting the mother to take the children to the United States before their trip to New York in August 2012, the parties had reached an understanding that the mother could take the children to New York for one year. The father, whose testimony the court credits based upon its observation of the

father on the witness stand, as well as upon the logic and consistency of his testimony, acknowledged that he agreed to have the mother take the children to New York for one year from August 2012 to August 2013, although he and the mother could not come to terms on the financial assurances or penalties for noncompliance by the mother. With respect to the father's credibility, the court was struck by the straightforward, literal and unembellished manner in which he answered questions. He readily conceded facts that were not to his advantage and remained steadfast and consistent in his testimony as to what occurred, regardless of whether or not a particular answer was to his advantage. As Mr. B. testified, he ultimately consented to the children going to the United States for one year, primarily to learn English, to give them an advantage or benefit he did not have. As the father stated, the parties had an agreement as to one year only, with certain financial adjustments to which both parents adhered.

Despite the mother's belated assertion that there was no firm agreement, her prior sworn statements that the initial trip to New York was for one year belie her later statements that it was for an indefinite period of time. In addition, based upon the mother's material inconsistencies in her sworn statements and testimony, as well as upon the court's observation of her demeanor on the witness stand, the court does not credit her testimony to the extent that it contradicts that of the father.

As noted earlier, the parties entered into detailed negotiations as to the planned one-year sojourn of the mother and children to the United States. The mother acknowledged during cross-examination that she had told the father during the initial negotiations that she intended to apply to Columbia and that, if she were accepted, she would attend Columbia for a year. Seeing the implications of that admission, the mother added, that although she said a year, she did not say "only" one year. Although the parties never signed the document, they ratified the document in part by having the mother pay for the father's visits with the children in the United States and making adjustments in child support obligations. The mother's early sworn statements aver that the parties initially agreed to a one-year stay in the United States. The negotiations focused on financial issues, not on whether or not the children could leave for one year.

The parties' understanding that the mother could take the children for one year from August 2012 to August 2013 has

great significance for the court's analysis. First, there was no wrongful removal of the children from Israel. The parties agreed to the one-year removal even though they did not sign a document. As that is the case, the claim by the mother and the attorney for the children that the father did not file the instant petitions within one year of the wrongful removal or retention of the children cannot prevail. The father filed the instant proceedings in early 2014, well within a year of the alleged wrongful retention of the children in August 2013; consequently, this court may not analyze whether or not the children are well settled in their new environment and should not be returned.

There is no question but that the retention of the children in the United States after the initial year of August 2012 to August 2013 was wrongful. The father never consented to the children staying for a second year and certainly not thereafter. The email exchanges between the parties and the father's credible testimony establish that he vehemently opposed the children remaining in the United States for a second year. The father broke down several times on the witness stand, describing his relationship with the children, how much parenting the children meant to him, and how much he missed them. Mr. B. is a straightforward person. He appears to the court as someone who would look to avoid litigation if at all possible, especially when his opponent is a highly experienced attorney managing her own firm. He simply wanted guarantees that the children would return to Israel, where all involved were born and raised and where the children and the parents still have extended family and other ties.

The period of wrongful retention commenced when the noncustodial parent, Mr. B., clearly communicated his desire to regain his custody rights and demanded the return of the children. (*Karkkainen v Kovalchuk*, 445 F3d 280 [3d Cir 2006], citing *Slagenweit v Slagenweit*, 841 F Supp 264, 270 [ND Iowa 1993].) In spring 2013, the father demanded return of the children as of August 2013. After not receiving an affirmative response and after exchanges with Ms. G., the father offered to allow the children to stay in New York for one final year, from August 2013 to August 2014 only if certain conditions were agreed upon and met, and only if that agreement were reduced to writing and signed by the mother, with the agreement ratified by the Family Court in Israel. The mother did not meet those conditions and the parents had no meeting of the minds as to a second year, and certainly no shared intent to change the

children's habitual residence. The father never abandoned attempts to have the children returned to Israel.

The mother's testimony as to whether or not the father agreed to a second year was inconsistent and not credible. The mother could not point to a specific time or instance in which the father consented, but at times appeared to base her understanding that the father consented on what M.B. told her about her conversation with her father. However M.B., then 11, interpreted the conversation with her father, the father made clear to M.B. that her parents, not M.B., would decide where she resided, and made clear to all his demand for the children to return home. It was also inappropriate and manipulative for the mother to use M.B. to try to convince the father that the children should stay another year. At another point in her testimony, the mother stated that she assumed that, after the father understood how happy the children were here, he would consent. Ms. G. equivocated as to whether she asked the father for consent for the children to stay another year or just told him that they were staying. She added that she did not feel that she needed his permission pursuant to the divorce agreement to have the children stay another year. Asked why she then bothered to raise the issue with the father, the witness stated that he was the father of the children and wanted to be informed. The mother added that the father had agreed for them to live in New York. Apparently manipulating the children, the mother told the children that the father would have an opinion as to them staying in New York, but that she was sure that he would agree if he saw how happy they were here. Again contradicting previous statements and further undermining her credibility, the witness testified that in the past two years, the children never indicated that they missed their father or wanted to see their father more often.

It is not even clear that Ms. G. and therefore the children can remain in the United States for very much longer. Ms. G. has a J1 student visa that permits her to be in this country as long as Columbia extends her visit and she continues to attend classes there; otherwise, the J1 visa expires and unless another status is obtained, she may then have to return to Israel. The children have J2 visas as a result of the mother's J1 visa. Ms. G. testified that her status at Columbia, where she pays a fee to attend classes, usually lasts two to three years. It is not a degree program. She does not know how long Columbia will allow her to remain a visiting fellow. Although the mother indicated that

she contemplates applying for another student-oriented program at another school, she has not applied for any such program. The court finds it noteworthy that the mother as recently as June 2013 tried to apply to a program at Yale, but found out that she was ineligible for the program. Matriculation at Yale would, of course, have required the children to relocate from New York.

The mother's retention of the children in New York impaired and prejudiced the father's rights of access to his children in direct contravention of a long-negotiated agreement incorporated into the 2007 Israeli order of divorce. Both parties agreed at trial that the father was at all times exercising his custody rights. Under these circumstances, the court finds that the mother's retention of the children in the United States as of August 2013 was wrongful.

As noted above, the court rejects respondent's first defense, as petitioner filed these petitions much less than one year following respondent's wrongful August 2013 retention of the children in the United States. With respect to respondent's second defense, although it is often denominated as the "wishes of the children" defense, the focus is not so much on the wishes as it is on a valid "objection" to returning to Israel. The court found the children to be very forthcoming. As the in camera interviews are confidential and are ordered sealed, subject to review by appellate courts, the court will reveal only that which is necessary.

The court does not seek to "split hairs" or focus on semantics, but "wishes," "preferences" and valid "objections" are to this court substantively different from one another when viewed in light of the underlying purposes of the Hague Convention and ICARA. The interviews were essentially confirmatory in nature. The parents agreed that the children were doing well here educationally, very much liked their school, enjoyed their friends and engaged in meaningful extracurricular activities. Both parents testified that M.B. wished to remain in the United States. The mother testified that G.B. did as well, although the father testified that G.B. related to him that he would do whatever his parents decided.

The children also discussed significant friendships that they had in Israel. Although the seven-hour time difference and personal schedules made extensive continued contact with friends in Israel more difficult, both children expressed connection to friends remaining in Israel. Both children were clear that they wished to remain here, at least for the time being.

M.B. in particular was mature for her age and expressed the basis for her preferences.

While both children indicated that they probably wanted to attend college in the United States, such an intent expressed by a 10-year-old does not carry particular weight, especially given the basis for this intent. (*See e.g. Tsai-Yi Yang*, 499 F3d at 279 [10-year-old not of sufficient age and maturity for views to be taken into account although child is borderline genius]; *Haimdas*, 720 F Supp 2d at 208 [nearly 10-year-old "hardly sufficiently mature" for court to take child's views into account concerning return]; *see also Mendez Lynch v Mendez Lynch*, 220 F Supp 2d 1347, 1362 [MD Fla 2002] [court considered views of nine-year-old, but child's opinion not conclusive given length of stay in country of wrongful retention and ordering return to further goals of Hague Convention].) It appears that the mother has indicated to G.B. that he might be a professional soccer player and would be able to play soccer in college if he remained in the United States. G.B. is very excited about soccer and is obviously doing well with his travel team. In fact, one of the first things G.B. did during the interview was show the undersigned a 10-second video of a goal he recently scored. The court welcomed the video and did note that G.B. demonstrated impressive footwork.

On the other hand, there is no reason that either or both children could not return to the United States to attend college. In analyzing a set of facts, any court brings to that analysis its own experiences. G.B. is a 10-year-old from Israel, who has played soccer from a very young age. That he stands out in soccer in New York at this age is not unusual. Children from other countries often excel in soccer in the United States, compared to children born in the United States; however, as the children become older and the other children gain experience, knowledge, strength and conditioning, those with an initial advantage do not always retain that advantage. We have no idea of what G.B.'s skill level, size, conditioning and health will be seven or eight years from now, and whether or not he will be recruited to play college soccer, no less professional soccer. No one knows at this point whether or not G.B. will want to dedicate himself to the stringent conditioning and exceptional time commitment it generally takes to be a recruited soccer player, usually to the near or complete exclusion of other activities. He may instead choose to be involved in baseball, music, robotics, drama or anything else over the next several years. It is simply unwise to

plan a 10-year-old's life around the possibility of being recruited to play college soccer, no less professional soccer. Of course, even from Israel, G.B. could be recruited to play college soccer in the United States, as many foreign-born players annually fill the ranks of recruited college soccer players. The court truly wishes G.B. well—he is a great kid—but to suggest at this stage of his life that he may be a professional soccer player if he remains in the United States is a little akin to telling a child with very good oral and/or analytical skills at age 10 that he could become President.

While M.B. expressed enthusiasm about remaining in New York and articulately expressed her reasons therefor, the court was at the same time impressed by M.B.'s description of her ties to Israel. Although she indicated that she wished to attend college in the United States, she made clear that she would first want to return to Israel after high school to serve in the Israeli Defense Force for three years to fulfill the commitment most children in Israel make to defend their country. The depth of her connection to Israel was very real, as was her wish to remain in the United States at this time.

The court found G.B. to be very sincere, but at his age, he does not demonstrate the level of maturity necessary to make a life-changing decision to remain in the United States. M.B. does demonstrate a real level of maturity, but neither child has focused upon what it would mean not to have their father in their life to the extent that he can participate in their day-to-day activities and decisions that materially affect their lives, as he had done since birth until the time the mother took them to the United States. As Mr. B. testified, he told M.B. that the decision as to whether or not she should remain in the United States was one for the parents, not the children.

Although the mother did not exercise undue influence upon the children, the court finds that at least a substantial portion of the children's current wish to stay in the United States resulted from the mother's wrongful retention of them here for a second year. If Ms. G. had fulfilled her end of the bargain and had returned the children to Israel after one year in New York, the children would have had what was anticipated and agreed upon by their parents (assuming good faith by both parents during the initial negotiations), one excellent year in which they further developed their skills in English, befriended good and interesting children, engaged meaningfully in a new educational system, were exposed to and enjoyed the people and culture of

New York, and then went home to both parents, their extended families and friends. Not surprisingly, the children found it more exciting and that there was more to do in New York City than in a small village in Israel. The court presumes that there is also much more to do and greater excitement in Tel Aviv or Jerusalem than in a small village in Israel. It was both wrongful and unwise for the mother to keep the children here for a second year without their father's consent, as they are now more involved in their lives in New York and leaving will be more disruptive to them.

In addition, the children do not "object" to being returned to Israel within the contemplation of this provision of the Hague Convention and ICARA. They clearly "prefer" or "wish" to remain here, but an objection within the meaning of the Convention and ICARA refers to a more substantial basis, such as fear of physical, emotional or psychological harm, or some substantive basis other than enjoying the activities in which they are engaged or liking their friends in their new environment or the opportunities that new environment presents. (*See Gonzalez Locicero v Nazor Lurashi*, 321 F Supp 2d 295, 298 [D PR 2004] ["The fact that the child prefers to remain in Puerto Rico, because he has good grades, has friends and enjoys sport activities and outings, is not enough for this Court to disregard the narrowness of the age and maturity exception to the Convention's rule of mandatory return"].) The court does not "determine whether a child is happy where it currently is, but whether one parent is seeking unilaterally to alter the status quo with regard to the primary locus of the child's life." (*Mozes*, 239 F3d at 1079.) To rule otherwise would effectively eviscerate the purposes of the Hague Convention by allowing a custodial parent wrongfully to remove or retain children in a new environment and allow that to continue indefinitely, seriously impairing the noncustodial parent's custody rights, because the children like living in an exciting, new environment.

As noted earlier, one of the purposes of the Convention is for courts in a child's new environment not to make best interest custody determinations, effectively usurping the role of the courts in the child's place of habitual residence (*Hazbun Escaf v Rodriquez*, 200 F Supp 2d 603, 610-611, 615 [ED Va 2002], *affd* 52 Fed Appx 207 [4th Cir 2002]), especially where, as here, the Israeli court made the initial child custody determination and the parents entered into a long-negotiated settlement which, inter alia, stipulated that only Israeli courts could modify that

agreement. A Hague Convention petition is not a child custody proceeding, but rather is more akin to a provisional remedy directing the return of a child wrongfully retained in a country. The merits of the child custody aspect is reserved for the courts in the child's country of habitual residence. (*Redmond v Redmond*, 724 F3d 729, 737 [7th Cir 2013].) Thus, even were this court to find that the children "object" to repatriation in Israel within the meaning of the Hague Convention, it would exercise its discretion to order the return of the children to Israel. If the Israeli Family Court believes it is in the children's best interest to remain in or revisit the United States, it has the power to modify its custody order.

## Conclusion

Accordingly, the court finds that Mr. B. has carried his burden of proving that Ms. G. wrongfully retained the children in New York after August 2013 and that there is no viable defense to an order directing the return of the children to Israel. The court therefore directs that the mother return the children to Israel promptly and in the exercise of all due diligence, but in any instance no later than 30 days from the date of this order to permit her to make appropriate arrangements for the return of the children to Israel. (*See e.g. Aly v Aden*, 2013 WL 593420, *19, 2013 US Dist LEXIS 19981, *68-69 [D Minn, Feb. 14, 2013, Civ No. 12-1960 (JRT/FLN)] [collecting citations].)

Finally, the father seeks reimbursement for attorney's fees and costs necessary to his petitions for return of the children. A court ordering return of a child is required to award the party enforcing his custodial rights necessary expenses, including fees, unless the respondent carries her burden of showing that an award of necessary expenses would be "clearly inappropriate." (22 USC § 9007 [former 42 USC § 11607] [b] [3]; *Ozaltin v Ozaltin*, 708 F3d 355, 375 [2d Cir 2013].) Given the wrongful retention in this matter, that application is granted to the extent of the court conducting an evidentiary hearing to determine the issue of fees and costs on September 30, 2014, 9:30 a.m. Either party may appear by telephone if unavailable in person. To assist the court in considering equitable factors, both parties shall submit a financial disclosure affidavit within two weeks from today. Counsel for Mr. B. must submit documentation in appropriate form to other counsel and to the court within 10 days from today as to fees and costs.