REVISED – December 18, 2000

**UNITED STATES COURT OF APPEALS**
**For the Fifth Circuit**

---

No. 00-20008

---

WILLIAM EDWARD ENGLAND,

Plaintiff-Appellant,

VERSUS

DEBORAH CAROL ENGLAND,

Defendant-Appellee.

---

Appeal from the United States District Court
For the Southern District of Texas

---

November 27, 2000

Before DUHÉ, EMILIO M.. GARZA, and DeMOSS, Circuit Judges.

DUHÉ, Circuit Judge:

This is an expedited appeal of the District Court's denial of a Petition for Return of Children under the Convention on the Civil Aspects of International Child Abduction (the "Hague Convention" or "the Convention"). The District Court held that even though two children were wrongfully removed by their mother from Australia, their country of habitual residence, to the United States in violation of the Hague Convention, they need not be returned to Australia because return would expose them to grave risks of psychological harm and because the older child objects to being returned. For the following reasons we reverse and remand.

BACKGROUND

William and Deborah England ("William" and "Deborah") have two children: Karina, age thirteen, and Victoria, age four. All parties are American citizens. The England family lived in Texas until 1997, when they moved to Australia incident to William's job transfer there. In June 1999, the Englands left Australia for an extended overseas vacation. They arrived in the United States in July 1999 for the last leg of their vacation. Their itinerary scheduled their return to Australia for July 15, 1999. As planned, William returned to Australia that day. Ostensibly concerned for the health of her cancer-stricken father, Deborah remained in the United States. Since, Deborah told her husband, the England girls' last chance to see their grandfather was perhaps at hand, Karina and Victoria remained in the United States with her instead of returning to Australia with William as planned.

A few weeks later, Deborah filed for divorce from William in Texas. Shortly thereafter, she phoned William and advised him that neither she nor their daughters would be returning to Australia. After Deborah refused William's various requests to return the children, William filed in the District Court a Petition for Return of Children Under the Hague Convention. After an Australian court determined that Australia was the "habitual residence" of Karina and Victoria and that their removal from Australia was "wrongful," the District Court heard and denied William's Hague Convention petition.

The Convention requires that a child wrongfully removed from her country of habitual residence be returned there upon petition unless, among other reasons not relevant here, clear and convincing evidence establishes that a grave risk of psychological harm attends her return or unless a court elects to heed the wishes of a sufficiently old and mature child who desires not to return. The District Court, agreeing with the Australian court, held that, within the meaning of the Convention, Karina and Victoria were wrongfully removed from their place of habitual residence. The Court, however, determined that Karina, an adopted child who prior to her adoption by the Englands had a "turbulent" history in orphanages and foster care and endured "difficult" adoption proceedings, would face a grave risk of psychological harm if separated from her mother or forced to move so soon after re-settling in Texas. See England v. England, No. H-99-2715 (S.D. Tex. Dec. 20, 1999) (order denying Motion Re-Urging the Petition for Return of Children Under the Hague Convention). The District Court also found that – notwithstanding her Attention Deficit Disorder, learning disabilities, Ritalin use, and emotional itinerancy (she has had four mothers in her thirteen years of life) – Karina was sufficiently mature for the Court to credit her desire to remain with her mother and not return to Australia. The Court declined to separate Victoria from her older sister because "it would be psychologically damaging to both girls to be separated from each other during the pendency of the [Englands'] custody

3

proceedings." <u>Id</u>. Accordingly, the Court allowed Karina and Victoria to remain in the United States with their mother.

William argues that the District Court erroneously held that Karina and Victoria's return to Australia pending the outcome of custody proceedings would subject them to grave risks of psychological harm. He also argues that Karina is not mature enough for a court appropriately to consider her wishes under the Hague convention.

## DISCUSSION

We review the District Court's factual findings for clear error and its legal conclusions *de novo*. <u>Sweatman v. Commercial Union Ins. Co</u>., 39 F.3d 594, 600 (5th Cir. 1994).

I.    Grave Risk

The District Court's holding that Karina and Victoria need not return to Australia under the terms of the Convention because return would expose them to grave risks of psychological harm was clearly erroneous because the evidence of these psychological risks is neither clear nor convincing.

Under Article 12 of the Convention,[1] when a child has been "wrongfully removed or retained," the "judicial or administrative authority of the Contracting State where the child is . . . <u>shall</u> order the return of the child forthwith." Convention on the Civil

---

[1]    Both Australia and the United States have signed and implemented the Convention, the latter through the International Child Abduction Remedies Act, 42 U.S.C. §§ 11601-11610 (1994).

4

Aspects of International Child Abduction, Oct. 25, 1980, art. 12, 51 Fed.Reg. 10493, 10498 (emphasis supplied). Article 13 of the Convention provides an exception to Article 12's rule of mandatory return in the event of "a grave risk that [the child's] return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation." Id., art. 13b, 51 Fed.Reg. at 10499. The Convention's implementing legislation, the International Child Abduction and Remedies Act ("ICARA"), requires that a party opposing a child's return prove the existence of such a grave risk by clear and convincing evidence. 42 U.S.C. § 11603 (e)(2)(A) (1994). Even if this "narrow" exception[2] applies, though, a federal court has "and should use when appropriate" the discretion to return a child to his or her place of habitual residence "if return would further the aims of the Convention." Friedrich v. Friedrich, 78 F.3d 1060, 1067 (6th Cir. 1996). The Convention's primary aims are to "restore the pre-abduction status quo and to deter parents from crossing borders in search of a more sympathetic court." Id. at 1063. Accordingly, the Convention prohibits courts considering Convention petitions from "adjudicating the merits of [the] underlying custody dispute[s]." Nunez-Escudero, 58 F. 3d at 376 (citations omitted).

---

[2] See, for example, Nunez-Escudero v. Tice-Menley, 58 F.3d 374, 376 (8th Cir. 1995); Rydder v. Rydder, 49 F.3d 369, 372 (8th Cir. 1995).

While admittedly the District Court and not this Court is the fact-finder, we nonetheless discern nothing in the record constituting clear and convincing evidence that return to Australia pending the outcome of custody proceedings there[3] would expose Karina to grave risks of psychological harm. The following is the whole of the District Court's findings regarding "grave risk" in this context:

> "Through Karina's testimony, however, Ms. England has established that given Karina's turbulent history in orphanages, foster care, and difficult adoption proceedings there is a grave risk of psychological harm if she should be separated from her mother or have to endure another move so soon after re-settling in Houston. There are two custody proceedings pending, one divorce proceeding in the United States and one in Australia, both of which have been temporarily abated pending the outcome of this proceeding. If the Court should send Karina back to Australia, one court or the other may well send her back to the United States after a full examination of her best interests. The Court finds that such movement back and forth poses a serious threat to her psychological welfare."

England v. England, No. H-99-2715 (S.D. Tex. Dec. 20, 1999) (order denying Motion Re-Urging the Petition for Return of Children Under the Hague Convention).

Courts considering this issue have uniformly found considerations such as those articulated by the District Court inapposite to the "grave risk" determination. See, for example, Nunez-Escudero, 58 F.3d at 377 ("The district court incorrectly

---

[3] A non-divorce custody proceeding in Australia is stayed pending the outcome of this litigation, as is Deborah's Texas divorce action.

6

factored the possible separation of the child from his mother in assessing whether the return of the child to Mexico constitutes a grave risk that his return would expose him to physical or psychological harm or otherwise place him in an intolerable situation"); Friedrich, 78 F.3d at 1067-68 ("Mrs. Friedrich alleges that she proved by clear and convincing evidence in the proceedings below that the return of Thomas to Germany would cause him grave psychological harm. Mrs. Friedrich testified that Thomas has grown attached to family and friends in Ohio. She also hired an expert psychologist who testified that returning Thomas to Germany would be traumatic and difficult for the child, who was currently happy and healthy in America with his mother. . . . If we are to take the international obligations of American courts with any degree of seriousness, the exception to the Hague Convention for grave harm to the child requires far more evidence than Mrs. Friedrich provides. Mrs. Friedrich alleges nothing more than adjustment problems that would attend the relocation of most children"); Walsh v. Walsh, 221 F.3d 204, 220 n.14 (1st Cir. 2000) ("We disregard the arguments that grave risk of harm may be established by the mere fact that removal would unsettle the children who have now settled in the United States. That is an inevitable consequence of removal"). The District Court's finding that return to Australia would expose Karina to a grave risk of psychological harm, then, was clearly erroneous.

Since the District Court found that the evidence of grave risk

7

to Victoria was even less clear and convincing than the evidence of grave risk to Karina, see England v. England, No. H-99-2715 (S.D. Tex. Dec. 20, 1999) (order denying Motion Re-Urging the Petition for Return of Children Under the Hague Convention) (" . . . moving back and forth would not pose the same psychological threat to Victoria as it would for her sister"), the Court's finding that return threatened Victoria with a grave risk of psychological harm was also clearly erroneous.

II.  Age and Maturity

The District Court also erred in determining that Karina is mature enough for the Court appropriately to consider her views under the Convention.[4]  The Convention establishes that a court "may refuse to order the return of the child if it finds that the child objects to being returned and has attained an age and degree of maturity at which it is appropriate to take account of its views."  Convention, art. 13, 51 Fed.Reg. at 10499.  The party opposing the child's return must establish the child's maturity by a preponderance of the evidence.[5]  42 U.S.C. § 11603(e)(2)(A)

---

[4]The dissent comments that we so conclude despite the absence of "any case holding that, under the Hague Convention, a 13 year-old is just too young as a matter of law to take account of her views." The dissent's concern is misplaced.  We do not hold that as a matter of law a 13 year-old is not sufficiently mature for her views to be considered.  We do hold that, on this record, a 13 year-old has not been shown to be mature enough for her views to be considered.  Indeed, the evidence found in the record which is recounted in this opinion points to the opposite conclusion.

[5]This burden is salient.  The dissent declares that when the record is examined for evidence regarding Karina's maturity, it

8

(1994).  Like the grave risk exception, the "age and maturity" exception is to be applied narrowly.  42 U.S.C. § 11601(a)(4) (1994); Nicholson v. Nicholson, No. 97-1273-JTM, 1997 WL 446432, at *3 (D. Kan. July 7, 1997) ("The child objection defense has been narrowly construed").

The Court's findings on this issue are even more limited than those on the grave risk exception:

> "In addition, Karina has clearly objected to being returned to Australia and she is old enough and mature enough for the Court to take account of her views.  She has maintained friendships with classmates here while living abroad, she likes it here and her situation has stabilized.  The Court, in accordance with Karina's stated preference, declines to return her to Australia."

England v. England, No. H-99-2715 (S.D. Tex. Dec. 20, 1999) (order denying Motion Re-Urging the Petition for Return of Children Under the Hague Convention).  The Court's findings, while certainly sensitive to Karina's emotional plight, nevertheless constitute a non sequitur.  That Karina has maintained her friendships with children in America, prefers America to Australia, and now enjoys a "situation [that] has stabilized" does not establish that she is mature enough for a court appropriately to consider her views on where she would prefer to live under the Hague Convention.  Rather,

---

discovered "no testimony by any...witnesses in the record that would raise even a genuine issue as to whether Karina was too young or too immature to have her views considered."  This underscores the dissent's error.  To prevail, William England need not show that Karina is "too immature to have her views considered." Rather, Deborah England, the party opposing the child's return to her place of habitual residence, must establish Karina's maturity by a preponderance of the evidence.  This she has failed to do.

9

these findings only establish that Karina prefers to remain in the United States and that some reasons support this preference. If anything, the preponderance of the evidence in this record suggests that Karina is not mature enough for the Court appropriately to take account of her views under the age and maturity exception. By no fault of her own, Karina has had four mothers in twelve years. She has been diagnosed with Attention Deficit Disorder, has learning disabilities, takes Ritalin regularly, and is, not surprisingly, scared and confused by the circumstances producing this litigation. In view of this evidence and the narrowness of the age and maturity exception to the Convention's rule of mandatory return, we hold that the District Court erroneously found Karina mature enough to trigger this exception to the Convention.

## CONCLUSION

We reverse the District Court and remand with instructions that the district court order Karina and Victoria returned to Australia forthwith pending the outcome of custody proceedings there in accordance with the Convention and for such other proceedings as may be appropriate.

REVERSED and REMANDED with instructions.

DeMOSS, Circuit Judge, dissenting:

I cannot concur in Part II "Age and Maturity" of the majority opinion. I write now to set forth the reasons why I believe the district court's conclusion as to the applicability of the age and maturity exception in Article 13 of the Hague Convention should be affirmed.

The specific language of this exception in Article 13 reads as follows:

> The judicial or administrative authority [the district court in this case] may also refuse to order the return of the child if it finds that the child objects to being returned and has attained an age and degree of maturity at which it is appropriate to take account of its views.

In her Order of December 20, 1999, Judge Gilmore stated:

> In addition, Karina has clearly objected to being returned to Australia and she is old enough and mature enough for the Court to take account of her views. She has maintained friendships with classmates here while living abroad, she likes it here and her situation has stabilized. The Court, in accordance with Karina's stated preference, declines to return her to Australia.

The language of Judge Gilmore's Order is a clear and precise exercise of the discretion vested in her by the express language of this exception in Article 13.

I do not find anything in the Convention or in the implementing statute passed by the U.S. Congress which speaks to standards of review to be applied by our Court in reviewing this decision of the district court. We should apply, therefore, our

normal requirements that give substantial deference to factual findings and credibility decisions made by the district court in a bench trial by requiring that we find that the district court "clearly erred" in making such factual decisions and credibility choices before discounting these views. I assume also that we would review de novo legal decisions of the district court.

I think as a reviewing court we need to keep in mind that Judge Gilmore heard and saw the testimony of Karina in person and had the benefit of that person-to-person evaluation in addressing the question of whether Karina was sufficiently old enough and mature enough to make it "appropriate to take account of [her] views." I have read Karina's testimony, and I saw nothing therein which would lead me to conclude that she is too young or too immature "to take account of [her] views." Furthermore, I saw no testimony by any of the other witnesses in the record that would raise even a genuine issue as to whether Karina was too young or too immature to have her views considered.

From my reading of her testimony, there is no doubt in my mind that Karina "objected to being returned to Australia," and Judge Gilmore so found. I do not see anything in the majority opinion which would indicate that the majority concluded that Judge Gilmore clearly erred in finding that Karina did in fact object to being returned to Australia. So the heart of our debate and discussion about the applicability of this exception revolves around the determination as to whether or not Karina has "attained an age and

12

degree of maturity" which makes it appropriate to take account of her objection. There is no question that at the time of her testimony in this case Karina was 13 years old. I have looked for and could not find, and the majority has not cited, any case holding that, under the Hague Convention, a 13 year-old is just too young as a matter of law to take account of her views. In regard to age, the Hague Convention itself states that it shall cease to apply to a child who attains the age of 16 years or more. *See* Article 4. If the age and maturity exception of Article 3 is to have any meaning at all, it must be available for a child who is less than 16 years old. The Hague Convention does not fix a minimum age at which this exception would become inapplicable. The Convention does recognize that, in states within which different territorial units have their own rules of law respecting custody and children, the laws of those territorial units may be used for determining the applicable law within the Convention. *See* Articles 31 and 33. In this regard, section 153.008 of the Texas Family Code states that "If the child is 10 years of age or older, the child may, by writing filed with the Court, choose the managing conservator, subject to the approval of the Court." While the child's preference as to managing conservator (the person having custody) is not controlling, it seems to me that a federal district judge sitting in Texas should be instructed by this statute that a child who is ten years or older is old enough to have his objection

13

considered by the Court. I would conclude, therefore, that Karina, as a 13 year-old, "has attained an age" sufficient to take account of her views. The majority does not separately address "age" as a factor in its decision.

We turn then to the "degree of maturity" element of this exception. From my reading of the record, I found no witness who testified as to any circumstances or events which would lead to a conclusion that Karina was "immature for her age." To the contrary, the record indicates that Karina was an average student academically, maintaining the school grade level commensurate with her age, and that she was engaged in a variety of sports and extracurricular activities. The words "degree of maturity" as used in Article 13 are inherently relative and subjective in their concept. But it seems self-evident to me that a "degree of maturity" contemplates something less than actual, full, final, complete maturity. For that reason, I recognize that judges reading the same record (or hearing the original testimony) could come to different conclusions on the subject of Karina's degree of maturity. But the conclusions reached by Judge Gilmore on that subject are clearly supported by the record. I disagree specifically with the evidence that the majority cites as supporting its position that Karina is not mature enough to take account of her views. In page 872, the majority states: "By no fault of her own, Karina has had four mothers in twelve years." While that is factually true, I would interpret it as enhancing

14

maturity. She has experienced adversity and rejection and has had several occasions to form an opinion as to the impact on her own life of changes in adoptive parents and changes in places of living. On that same page, the majority also refers to her diagnosis with Attention Deficit Disorder, her learning disabilities, and the fact that she takes Ritalin regularly as evidence indicating that she is immature. There is no expert testimony whatsoever in the record which would support a correlation between these circumstances and immaturity. I am surprised that the majority is willing to draw these conclusions without the benefit of testimony in the record from a medical doctor or psychologist. The impression I got from reading the lay testimony in the record is that by taking Ritalin, Karina effectively overcomes any learning disability related to ADD. There is nothing in the record which would compel a conclusion that Karina evidences immature behavior as the result of taking Ritalin.

Finally, I have to disagree with the majority's legal assessment in page 872 that the age and maturity exception is to be subjected to some "narrow" interpretation. Nothing in the Convention itself states that the exceptions set forth in Article 13 shall be "narrowly construed." As the only authority for its view, the majority cites to 42 U.S.C. § 11601(a)(4), which is a part of the Congressional Findings and Declarations which Congress made when it adopted the statute implementing the Hague Convention. In this text, the word "narrow" is used only as an adjective

15

modifying the noun "exception;" and nothing in the remainder of the statutory text speaks to the manner in which a court should address the task of construing language in the statute. While congressional findings may be looked to for purposes of clarifying an ambiguity in the text of a statute, they should not be used for the purpose of inserting into the statute a provision not otherwise addressed.

For the foregoing reasons, I think Judge Gilmore was on completely solid ground in her decision not to return Karina to Australia because of Karina's objection to being so returned and in her finding that Karina was of sufficient age and maturity that the court could give recognition to this objection.

Because of her ruling as to Karina, Judge Gilmore had to decide what to do about Victoria (the four year-old). As to Victoria, Judge Gilmore's Order now before us states the following:

> While moving back and forth would not pose the same psychological threat to Victoria as it would for her sister and she is too young to articulate a preference, the Court declines to separate her from her older sister and finds that it would be psychologically damaging to both girls to be separated from each other during the pendency of the custody proceedings. Accordingly, Mr. England's Petition is DENIED.

This case presents us with a special circumstance as to what the district court should do when there are two children involved, one sufficiently old and mature to warrant the Court recognizing her objection to being returned to Australia and the other too young to articulate a preference. I have looked and can find nothing in the

16

Hague Convention itself nor in the enabling legislation in the United States Code which speaks to the circumstance of multiple siblings being the subject of a demand for return.  Given the silence of the Hague Convention and the enabling legislation on this subject, it seems to me that a district court can and should exercise its judicial discretion to formulate an applicable rule.  One approach might be to treat each child as a separate person, applying the literal language of the Convention to each and contemplating that the result may be that one child has to be returned and the other does not.  To me, that would be a wasteful and inefficient approach, which leads, in this case, to potential conflict between the courts of Australia and the courts of the United States as to the terms and conditions of the divorce itself and, more particularly, the custody questions that would necessarily flow therefrom.  An alternative approach would be to recognize the desirability of a single decree dealing both with the divorce and the child custody issues and allow the court before whom the Hague petition is pending to make a decision between the two national jurisdictions on the basis of which jurisdiction has the greater degree of contact and interest in the resolution of the disputes between the parties involved.  I think Judge Gilmore was reaching for this type of solution when she found that it would be psychologically damaging to both girls for them to be separated from each other during the pendency of the custody proceedings and that there was a value to be served by not separating Victoria from

17

her older sister.

In this particular case, the interest of Australia in deciding the controversies is de minimis and the interest of the United States in deciding these controversies is overwhelming. The following facts, which are clearly established by the record in this case, support this conclusion:

1. William, Deborah, Karina, and Victoria are each citizens of the United States and **not** of Australia. Each of them carry U.S. passports.

2. William and Deborah were married in Houston, Texas, U.S.A. and **not** in Australia. During a majority of the time of their marriage they resided in Houston, Texas, U.S.A.

3. Karina was born in Chile, **not** Australia, and she was adopted by William and Deborah pursuant to a court decree entered in a state court of Texas, U.S.A. At the time of this controversy she was 13 years old.

4. Victoria was born in Houston, Texas, U.S.A and **not** Australia. At the time of this controversy she was four years old.

5. Both the parents of William and the parents of Deborah (the grandparents of the children) are citizens of and reside in the United States.

6. William entered Australia pursuant to an Australian temporary work visa; Deborah and the two daughters entered and remained in Australia solely pursuant to visas issued to them as

18

dependents of William. The visas of the two daughters expired in August 1999.

7. William was employed in Australia by a U.S. entity and not an Australian employer.

8. When William and Deborah left for Australia in 1997, they owned a home in Houston which they had been living in for four years. They also owned other real property in the State of Texas. This property would be community property under the laws of Texas. They did not sell their home in Houston, and all of the real property remains as jointly owned property to be dealt with in any divorce decree.

9. Prior to their departure from Australia on vacation in June 1999, neither William nor Deborah had filed any petition with any Australian court seeking a divorce or child custody decree. In fact, neither William nor Deborah could have filed such a petition for such relief because at that time they had not separated and lived apart for 12 months as required by Australian law.

10. When William and Deborah and their two daughters left Australia in June 1999 on a vacation trip home, they did so jointly, freely, and voluntarily. There was no wrongful abduction or denial of custody rights of any kind as of the time of their departure from Australia.

11. When he returned to Australia towards the end of July 1999, William agreed at least tacitly to the decision of Deborah to remain in Houston with the two children.

19

The foregoing facts are unique to this case and distinguish this case from the three cases cited and relied upon by the majority in their opinion.[6]

Under these circumstances, balancing the interests of Australia and the interests of the United States, it is self-evident that the interests of the United States greatly outweigh the interests of Australia. Consequently, the decision of Judge Gilmore to decline to return the two daughters to Australia is a sensible solution to a difficult problem: it avoids potential conflicts between separate court proceedings; it saves all parties the expense of duplicitous court proceedings; and it permits a quicker resolution of all the parties' controversies. Therefore, I would affirm the district court's decision to decline to return Karina and Victoria to Australia.

I conclude with some comments about the frightening precedent that the majority opinion in this case will set. The net effect of the Hague Convention as applied by the majority is to compel the initiation of divorce proceedings in foreign lands between American

---

[1]  See **Friedrich *v. Friedrich***, 78 F.3d 1060 (6th Cir. 1996). Father, a German citizen, married mother, a United States citizen, in Germany.  One child born in Germany removed from Germany to United States when child was two years old; ***Nunez-Escudero v. Tice-Menley***, 58 F.3d 374 (8th Cir. 1995).  Father, a Mexican citizen, married mother, a United States citizen, in Mexico.  One child born in Mexico, removed from Mexico to United States when child was six months old; ***Rydder v. Rydder***, 49 F.3d 369 (8th Cir. 1995).  Father, a Danish citizen, married mother, a United States citizen, in Sweden.  Two children born in Sweden removed from Poland to United States when one was four years old and the other two years old.

20

couples who have children and who are overseas because of work assignments. My guess is that very few American couples are forewarned about the Hague Convention before they accept work assignments overseas. When all the players (husband/father, wife/mother, and children) are American citizens, who have spent the large majority of their lives living in the United States, whose relatives are back in the United States, who have property in the United States, and who voluntarily come back to the United States for a visit, it will come as a very disturbing shock to learn that they must return to the foreign work country and its courts to resolve their marital problems and child custody disputes. This is a trap that employers who send their employees overseas should be certain that the spouses and children of their employees have considered. From my reading of the record in this case, I am quite certain that Deborah England would have never consented to go to Australia with her husband in 1997 if she had been aware of the impact of the Hague Convention on any future marital discord while they were in Australia.

For the foregoing reasons, I dissent.

21