# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 15-40048

United States Court of Appeals
Fifth Circuit

**FILED**

March 28, 2016

Lyle W. Cayce
Clerk

PEDRO ANTONIO FLORES RODRIGUEZ,

Plaintiff - Appellant

v.

YOLANDA IVONNE SALGADO YANEZ; A. S. F. S., A Minor Child,

Defendants - Appellees

Appeal from the United States District Court
for the Eastern District of Texas

Before HIGGINBOTHAM, SOUTHWICK, and HIGGINSON, Circuit Judges.
PATRICK E. HIGGINBOTHAM, Circuit Judge:

Appellant Pedro Antonio Flores Rodriguez petitioned for the return of his child, A.S.F.S., under the Hague Convention on the Civil Aspects of International Child Abduction and the International Child Abduction Remedies Act. The district court denied Flores's petition. Flores now appeals, and we REVERSE in part, VACATE in part, and REMAND for further proceedings consistent with this opinion.

I.

Appellant Pedro Antonio Flores Rodriguez ("Flores") and Appellee Yolanda Ivonne Salgado Yanez ("Salgado") are the parents of A.S.F.S., an

No. 15-40048

eleven-year-old girl.[1] A.S.F.S. was born in Chihuahua, Mexico on January 6, 2005. A.S.F.S. lived in Mexico until October 2013, when Salgado took her to the United States without Flores's permission. On July 17, 2014, Flores filed a petition in the Eastern District of Texas seeking the return of A.S.F.S. to Mexico under the Hague Convention on the Civil Aspects of International Child Abduction[2] and the International Child Abduction Remedies Act.[3] The district court appointed a guardian ad litem for A.S.F.S. and held a show cause hearing on the petition in November 2014.

A. *Show Cause Hearing*

The lion's share of the show cause hearing was devoted to the testimony of the two parents. Flores and Salgado testified consistently as to the general course of their relationship. They met in either 2001 or 2002 in Torreón, Mexico. Both were married at the time, but they began a romantic relationship soon after meeting. Salgado discovered that she was pregnant with A.S.F.S. in 2004. Flores initially denied that he was the father, but eventually acknowledged paternity and was present when A.S.F.S. was born. After A.S.F.S.'s birth, Flores continued to live with his wife—who did not know about his relationship with Salgado or A.S.F.S.—but he sometimes spent the night at Salgado's house. Flores testified that he would stay with Salgado and A.S.F.S. four to five days a month while Salgado testified that it was only one day a month. Flores also provided Salgado and A.S.F.S. with financial assistance. While he was working as a federal police officer, Flores "paid the water, the electric bill, the telephone, and food." In addition, Flores paid for

---

[1] The district court and Salgado refer to the child as A.S.F.S. while the guardian ad litem and Flores, at least in his opening brief, refer to the child as A.S.F.G. The record reflects that A.S.F.S. is the correct abbreviation.

[2] Oct. 25, 1980, T.I.A.S. No. 11,670, 1343 U.N.T.S. 89, *reprinted in* 51 Fed. Reg. 10,494 (Mar. 26, 1986).

[3] 22 U.S.C. §§ 9001-11.

2

A.S.F.S. to attend private school. After Flores retired in 2007, the financial support became more irregular, but Salgado testified that he still paid her bills "probably eight or nine months" out of the year.

In either 2011 or 2012, Salgado and A.S.F.S. left Torreón and moved into Salgado's mother's house in Chihuahua. Salgado testified that she moved because she was fearful of Flores, who she alleged was physically abusive and an alcoholic. Though Chihuahua and Torreón are several hours apart, Flores traveled to Salgado's mother's house "[e]very month or every month and a half." In October 2013, Salgado and A.S.F.S. crossed into the United States using "six-month entry card[s]." Salgado told Flores that they would only be gone for a few weeks while they visited relatives. Salgado's intention, however, was to permanently remain in the United States. Once Salgado and A.S.F.S. crossed, Flores had difficulty contacting them. Although Salgado told Flores that she and A.S.F.S. were in Denver, they were actually in Texas. After staying briefly with two different friends, Salgado moved into her boyfriend's apartment in Tyler, Texas. Flores was eventually able to get in touch with Salgado and A.S.F.S., but his contact with A.S.F.S. has remained limited.

Beyond these background facts, Flores and Salgado testified very differently about Flores's relationship with A.S.F.S. Flores testified that they had a "beautiful" relationship with "very nice communication." Flores elaborated that he often helped A.S.F.S. with her homework, took her to school events, and went to the park and the movies with her. Salgado testified that she never allowed Flores to be alone with A.S.F.S. because she "didn't trust him." Salgado explained that "every time he's spent time or tried to spend time with [her] by himself, he always bother[s] her accosting her with questions towards me to the point that the girl was afraid and . . . cr[ied]." Salgado also testified that Flores was "very aggressive" and physically abused her in front of A.S.F.S. "[m]any times," although he was never violent with A.S.F.S.

3

No. 15-40048

Salgado acknowledged that Flores regularly visited Chihuahua, but testified that "he only came to see [her] . . . [b]ecause he has never cared for [A.S.F.S.]." Salgado added that Flores was "drunk" and "[a]lmost always" violent during these visits.

After Flores and Salgado completed their testimony, the district court briefly questioned A.S.F.S. in chambers. A.S.F.S. testified that her relationship with her father was poor. She indicated that Flores never spent time with her and did not even speak to her except to ask questions about Salgado's love life. A.S.F.S. explained that she "would just go to [her] room" when Flores visited Chihuahua because "he was always drunk" and would say "ugly things . . . [l]ike dirty words." She characterized the relationship between her parents as "[f]ighting" and reported that she had seen Flores "push[]" Salgado.

At two different points, the district court asked A.S.F.S. whether she was happier living in Mexico or the United States. A.S.F.S. testified that she was happier in Texas, although she was happy living in Mexico too:

> Q. . . . Are you happy living here in Texas?
>
> A. Yes.
>
> Q. Okay. Now, you lived in Mexico before Texas; is that right?
>
> A. Yes.
>
> Q. Were you happy living in Mexico?
>
> A. Yes.
>
> Q. Well, do you like living in Texas better, or do you like living in Mexico better?
>
> A. Texas.
>
> . . . .
>
> Q. So, [A.S.F.S.], I asked you this before but I will just ask you again: Are you happier here in Texas or in Mexico?

4

No. 15-40048

A. In Texas.

Q. Why are you happier here?

A. Because I am going to be able to learn more languages, and I want to learn much more in here.

B. *District Court's Decision*

In December 2014, the district court issued a decision in Salgado's favor. The district court agreed with Flores that A.S.F.S. was (1) a "habitual resident" of Mexico at the time of removal and that (2) her removal was in breach of Flores's custody rights under Mexican law. Nevertheless, the district court denied Flores's petition because he "was not exercising his custody rights at the time of A.S.F.S.'s removal to the United States." After summarizing the evidence, the district court reasoned as follows:

> [Flores] adduced insufficient evidence that he provided any physical care or financial assistance to A.S.F.S. during the time she was living with [Salgado] in Chihuahua. In addition, the Court heard uncontroverted testimony that during almost all of his visits to Chihuahua, [Flores] physically and verbally abused [Salgado] in front of A.S.F.S. Thus, the evidence before the Court indicates that [Flores] visited Chihuahua about once a month in order to harass [Salgado], rather than spend time with or provide care for A.S.F.S. In fact, during A.S.F.S.'s *in camera* interview, she indicated that the only contact she had with [Flores] was when he pressured her for details about [Salgado]'s activities. Moreover, testimony from both parties indicated that [Flores] had frequent contact with A.S.F.S. while she was living in Torreón. However, [Flores] did not present any evidence indicating that he actively sought a custody determination or other form of judicial relief in Mexico after [Salgado] moved A.S.F.S. to Chihuahua—more than five hours from [Flores]'s residence in Torreón.

The district court also denied Flores's petition for the independent reason that A.S.F.S. "objects to being returned and has attained an age and degree of maturity at which it is appropriate to take account of [her] views." The district court briefly explained:

> Based upon the *in camera* interview, the Court finds that it is

5

No. 15-40048

appropriate to take into account A.S.F.S.'s views.   Despite becoming shaken and upset while describing her relationship with [Flores], A.S.F.S. exhibited strong cognitive and social abilities, and clearly expressed a desire to remain with [Salgado] in the United States. Further confirming her maturity, A.S.F.S. stated that she would be happier remaining in the United States because she would have greater educational opportunities, and the ability to learn more languages.

Flores timely appealed to this Court.

## II.

We review the district court's findings of fact for clear error and its legal conclusions *de novo*.[4]  "A factual finding is not clearly erroneous as long as it is plausible in the light of the record as a whole."[5]

## III.

Under the Hague Convention on the Civil Aspects of International Child Abduction, "courts in contracting countries must return a wrongfully-removed child to his country of habitual residence."[6]   The Convention, however, "provides several narrow affirmative defenses to wrongful removal."[7]  Two are relevant here: (1) "the judicial or administrative authority of the requested State is not bound to order the return of the child if the person, institution or other body which opposes its return establishes that . . . the person, institution or other body having the care of the person of the child was not actually exercising . . . custody rights at the time of removal or retention";[8] and (2) "[t]he judicial or administrative authority may . . . refuse to order the return of the child if it finds that the child objects to being returned and has attained an age

---

[4] *Sealed Appellant v. Sealed Appellee*, 394 F.3d 338, 342 (5th Cir. 2004).

[5] *Id.* (quoting *United States v. Powers*, 168 F.3d 741, 752 (5th Cir. 1999)).

[6] *Id.* at 342-43.

[7] *Id.* at 343.

[8] Convention art. 13(a).

No. 15-40048

and degree of maturity at which it is appropriate to take account of its views."[9] The only dispute in this case is whether Salgado has established one or both of these "affirmative defenses." Salgado does not challenge the district court's conclusion that A.S.F.S. was wrongfully removed. But she does defend the district court's conclusion that Flores's petition should be denied because either (1) Flores was not exercising his custody rights at the time of removal or (2) A.S.F.S. objects to being returned and has attained an age and degree of maturity at which it is appropriate to take account of her views. If Salgado has established either of these defenses, the district court did not err in denying Flores's petition. If neither applies, A.S.F.S. must be returned to Mexico. We address each defense in turn.

A.

Under Article 13(a), a court does not have to order the return of a wrongfully removed child if the non-removing party was not "exercising" his custody rights at the time of removal. Article 13(a) does not define "exercising," so courts have looked to the Convention's underlying purposes for guidance in applying this exception. The Supreme Court recently expounded on these purposes, explaining that "[t]he Convention is based on the principle that the best interests of the child are well served when decisions regarding custody rights are made in the country of habitual residence."[10] This means that "courts in countries other than that of the child's habitual residence" are prohibited from "adjudicating the merits of the underlying custody dispute."[11] "To avoid th[e] possibility" of "cross[ing] the line into a consideration of the underlying custody dispute," "American courts have interpreted 'exercise'

_____

[9] *Id.* art. 13(b).
[10] *Abbott v. Abbott*, 560 U.S. 1, 20 (2010).
[11] *Sealed Appellant*, 394 F.3d at 344 (quoting *Nunez-Escudero v. Tice-Menley*, 58 F.3d 374, 376 (8th Cir. 1995)).

broadly."[12]    This Court, like many others,[13] has adopted the expansive interpretation of "exercise" articulated by the Sixth Circuit in *Friedrich v. Friedrich* (*Friedrich II*).[14]   Under this standard, "when a parent has custody rights under the laws of that country, even occasional contact with the child constitutes 'exercise' of those rights.  To show failure to exercise custody rights, the removing parent must show the other parent has abandoned the child."[15] "Once it determines that the parent exercised custody rights in any manner, the court should stop—completely avoiding the question whether the parent exercised the custody rights well or badly.  These matters go to the merits of the custody dispute and are, therefore, beyond the subject matter jurisdiction of federal courts."[16]

Though this Court "defer[s] to the district court's credibility determinations" regarding exercise, this Court reviews the district court's application of this standard *de novo*.[17]  Upon *de novo* review, we easily conclude that Flores was exercising his custody rights at the time of removal.  In *Sealed Appellant*, this Court held that evidence that the petitioner "visited the children about five times a year and paid child support to [the mother]" was sufficient to demonstrate exercise of custody rights.[18]  In this case, the evidence of exercise is effectively identical.  Salgado testified at the show cause hearing that Flores visited A.S.F.S. at least once every six weeks, or around 8 times a year.  Salgado also concedes in her brief that Flores "paid the fees" for

---

[12] *Id.*

[13] *See Walker v. Walker*, 701 F.3d 1110, 1121-22 (7th Cir. 2012); *Asvesta v. Petroutsas*, 580 F.3d 1000, 1018-19 (9th Cir. 2009); *Bader v. Kramer*, 484 F.3d 666, 670-72 (4th Cir. 2007); *Baxter v. Baxter*, 423 F.3d 363, 369-70 (3d Cir. 2005) (Alito, J., on panel).

[14] 78 F.3d 1060 (6th Cir. 1996).

[15] *Sealed Appellant*, 394 F.3d at 345.

[16] *Id.* (quoting *Friedrich II*, 78 F.3d at 1066).

[17] *See id.*

[18] *Id.*

A.S.F.S.'s public school in Chihuahua.[19]   "By visiting [A.S.F.S.] and contributing to [her] financial support," Flores was exercising his custody rights.[20]

Despite these clear parallels, Salgado urges that her "mistress relationship" with Flores distinguishes this case from *Sealed Appellant*. That is, like the district court, she contends that any contact that Flores had with A.S.F.S. was merely incidental to seeing her.[21] Such arguments, however, go to whether Flores was exercising his "custody rights well or badly." Regardless of whether Flores was interested in seeing A.S.F.S. when he traveled to Chihuahua, the record is undisputed that he did maintain *some* sort of relationship with her, which is enough to demonstrate exercise.[22] The district court's suggestion that Flores did not "actively s[eek] a custody determination" because he did not care about A.S.F.S. is irrelevant for the same reason—it concerns the quality of Flores's relationship with A.S.F.S., not whether he was exercising his custody rights. Accordingly, the district court erred in concluding that Flores was not exercising his custody rights at the time of removal.

B.

"The Convention establishes that a court 'may refuse to order the return of the child if it finds that the child objects to being returned and has attained an age and degree of maturity at which it is appropriate to take account of its

---

[19] Salgado's Brief at 3; *see also* Guardian Ad Litem's Brief at 3 (same).

[20] *Sealed Appellant*, 394 F.3d at 345.

[21] Salgado's Brief at 12-13.

[22] See *Bader v. Kramer*, 484 F.3d 666, 671 (4th Cir. 2007) ("[W]e will 'liberally find "exercise" whenever a parent with *de jure* custody rights keeps, or seeks to keep, any sort of regular contact with his or her child.'" (quoting *Friedrich II*, 78 F.3d 1060, 1065 (6th Cir. 1996))).

views.'"[23] Salgado has the burden to establish that this exception applies.[24] In order to carry this burden, Salgado must establish two distinct facts: (a) A.S.F.S. "has attained an age and degree of maturity at which it is appropriate to take account of [her] views"; and (b) A.S.F.S. "objects to being returned."[25] As with other exceptions to the Convention, this Court has instructed that the age and maturity exception "is to be applied narrowly."[26]

The main thrust of Flores's briefing is that Salgado has not established that A.S.F.S. "objects to being returned." Nevertheless, there are also a few passages that suggest that A.S.F.S. has not "attained an age and degree of maturity at which it is appropriate to take account of [her] views."[27] Assuming Flores has properly presented this separate argument, it has no merit. "Whether the child has reached an appropriate age and degree of maturity is a factual determination and thus subject to clear error review."[28] "And, given the reliance on live oral testimony, 'the clearly erroneous standard is particularly strong because the judge had the opportunity to observe the

---

[23] *England v. England*, 234 F.3d 268, 272 (5th Cir. 2000) (quoting Convention art. 13(b)).

[24] *See id.* at 272; *see also id.* at 272 n.5 (noting that the "burden" was "salient" to this Court's decision); *Sealed Appellant*, 394 F.3d at 343.

[25] *See Vasconcelos v. Batista*, 512 F. App'x 403, 405-08 (5th Cir. 2013) (treating the inquiries as distinct); *see also England*, 234 F.3d at 272-73 (suggesting that the inquiries are distinct).

[26] *England*, 234 F.3d at 272; *see also Tsai-Yi Yang v. Fu-Chiang Tsui*, 499 F.3d 259, 278 (3d Cir. 2007); *Locicero v. Lurashi*, 321 F. Supp. 2d 295, 298 (D.P.R. 2004).

[27] Flores's Opening Brief at 32 (arguing that Salgado did not carry her burden of establishing that A.S.F.S. "understood what she was being asked"); *id.* at 34 (arguing that A.S.F.S. did not "understand the consequences of a decision to remain in the United States"). At oral argument, counsel further suggested that the issue of whether A.S.F.S. objected is "intertwined" with her age and degree of maturity. We decline to consider this argument because it was not raised in Flores's opening brief. *See Comsat Corp v. FCC*, 250 F.3d 931, 936 n.5 (5th Cir. 2001) ("Arguments presented for the first time at oral argument are waived.").

[28] *Vasconcelos*, 512 F. App'x at 405; *see also Dietz v. Dietz*, 349 F. App'x 930, 934 (5th Cir. 2009); *Simcox v. Simcox*, 511 F.3d 594, 604 (6th Cir. 2007).

demeanor of the witness[es].'"[29]  This standard is dispositive here.  As in the typical Convention case, the district court had the opportunity to personally observe and question A.S.F.S.  Based on this interaction, the court concluded that A.S.F.S. "exhibited strong cognitive and social abilities."  Though this conclusion is not necessarily dictated by the transcript, Flores points to nothing that leaves us with "the definite and firm conviction that a mistake has been made."[30]  In fact, the only thing that Flores does point to is A.S.F.S.'s young age at the time of the hearing.  This Court, however, has "declined to hold, as a matter of law, that any particular age is sufficient or insufficient to meet the defense."[31]

Whether A.S.F.S. "objects to being returned" is more difficult.  Salgado and A.S.F.S.'s guardian ad litem both assert that "A.S.F.S. listed [the following] reasons for her objection to returning to Mexico:"

- Her father's psychological harassment of her mother;
- Her father's physical abuse of her mother;
- Her father's use of foul language;
- His interrogation of her for information on her mother;
- Her fear of her father.[32]

Flores argues that these reasons cannot form the basis of an objection under the Convention.  That is, he contends that a wrongfully removed child may not object to returning to her *country* of habitual residence because she does not want to live with the petitioning *parent*.  Flores urges that honoring an objection based upon a wish to live with a particular parent would embroil the

---

[29] *Dietz*, 349 F. App'x at 934 (alteration in original) (quoting *United States v. Santiago*, 410 F.3d 193, 197 (5th Cir. 2005)).

[30] *See Sealed Appellant v. Sealed Appellee*, 394 F.3d 338, 345 (5th Cir. 2004) (quoting *Tulia Feedlot, Inc. v. United States*, 513 F.2d 800, 806 (5th Cir. 1975)).

[31] *Dietz*, 349 F. App'x at 934 (citing *England*, 234 F.3d at 272 n.4).

[32] Salgado's Brief at 17; Guardian Ad Litem's Brief at 9-10.

state of refuge in the underlying custody dispute and reward abducting parents for their misconduct. Although this position is not without some appeal, and support,[33] we disagree. The Pérez-Vera Explanatory Report—which "is recognized as the official history, commentary, and source of background on the meaning of the provisions of the Convention"[34]—provides the following commentary on the age and maturity exception:

> In addition, the Convention also provides that the child's views concerning the essential question of its return or retention may be conclusive, provided it has, according to the competent authorities, attained an age and degree of maturity sufficient for its views to be taken into account. In this way, the Convention gives children the possibility of interpreting their own interests. Of course, this provision could prove dangerous if it were applied by means of the direct questioning of young people who may admittedly have a clear grasp of the situation but who may also suffer serious psychological harm if they think they are being forced to choose between two parents. However, such a provision is absolutely necessary given the fact that the Convention applies, *ratione personae*, to all children under the age of sixteen; the fact must be acknowledged that it would be very difficult to accept that a child of, for example, fifteen years of age, should be returned against its will.[35]

This commentary indicates that the age and maturity exception is rooted in the autonomy of the wrongfully removed child. The drafters of the Convention sought to deter wrongful removals, but they also recognized that wrongfully removed children are not inanimate objects—they are people with

---

[33] *See Hirst v. Tiberghien*, 947 F. Supp. 2d 578, 597 (D.S.C. 2013) ("The defense does not apply if the 'objection is simply that the child wishes to remain with the abductor.'" (quoting *In re Nicholson*, No. 97-1273-JTM, 1997 WL 446432, at *3 (D. Kan. July 7, 1997))); *Haimdas v. Haimdas*, 720 F. Supp. 2d 183, 208 (E.D.N.Y.), *aff'd*, 401 F. App'x 567 (2d Cir. 2010); *Lieberman v. Tabachnik*, 625 F. Supp. 2d 1109, 1126 (D. Colo. 2008); *Hazbun Escaf v. Rodriquez*, 200 F. Supp. 2d 603, 615 (E.D. Va.), *aff'd*, 52 F. App'x 207 (4th Cir. 2002).

[34] *Sealed Appellant*, 394 F.3d at 343.

[35] Elisa Pérez–Vera, *Explanatory Report: Hague Convention on Private International Law* ¶ 30, *available at* https://assets.hcch.net/upload/expl28.pdf.

agency of their own. The age and maturity exception acknowledges this agency by allowing a sufficiently mature child to "interpret[] [her] own interests." The Pérez-Vera Explanatory Report does not suggest the child's interpretation of her "own interests" is invalid if it is based on her wish to stay with the abducting parent. To the contrary, the Report acknowledges that the child may "think [she] [is] being forced to choose between two parents," but states that this "danger[]" must be tolerated because "such a provision is absolutely necessary." As the closing example demonstrates, the drafters of the Convention simply deemed it inappropriate to return a mature child "against its will"—whatever the reason for the child's objection. In such cases, the child's autonomy trumps the Convention's interest in preventing wrongful removals.

We have serious doubts that a rule to the contrary would be administrable. For most wrongfully removed children, the choice between countries is effectively a choice between parents. If the court honors the child's objection to returning, she will almost certainly live with the abducting parent—at least until the custody dispute is resolved. As a result, whether the child *wants* to live with the abducting parent is very relevant to her interpretation of her immediate "interests." Indeed, it is likely the most important consideration. We fear that a rule formally prohibiting objections based upon this consideration would result in hearings full of winks and nods. Rather than express the real reason for her objection, a wrongfully removed child would be coached to testify that she has strong preferences about where she goes to school, but no preference about who she lives with or who takes care of her. The district court, and this Court on appeal, would then be tasked with the impossible task of determining if the child was dissimulating. Flores might respond that the rule we adopt invites a different form of coaching, as the abducting parent will instruct the child to testify that she would prefer to

live with her. The State Department, however, has instructed that "[a] child's objection to being returned may be accorded little if any weight if the court believes that the child's preference is the product of the abductor parent's undue influence over the child."[36]  Flores is correct that a child's objection should be ignored if the court believes the abducting parent has exercised "undue influence over the child."[37]  But otherwise, as we see it, an objection by the child to being returned, if found to be a considered and mature decision, will be honored whether or not it rests in part on her objection to living with the abducting parent.

Even so, Flores urges that A.S.F.S. did not "object[]" to returning to Mexico—she only expressed a *preference* for the United States.  During her *in camera* interview, A.S.F.S. testified that she "like[s] living in Texas better" than Mexico and is "happier here in Texas" than in Mexico.  But she also testified that she was "happy living in Mexico."  Flores argues that that these statements amount only to a preference for the United States—and do not satisfy the plain language of the age and maturity exception.  We agree with Flores that the Convention requires an "object[ion]," not a mere preference.  The Supreme Court has instructed that the interpretation of the Convention, "like the interpretation of a statute, begins with its text."[38]  The text of the Convention restricts the age and maturity exception to cases in which the child

---

[36] Hague International Child Abduction Convention; Text and Legal Analysis, 51 Fed. Reg. 10,494, 10,509 (Mar. 26, 1986).  As with any treaty, "[i]t is well settled that the Executive Branch's interpretation of" the Convention "is entitled to great weight." *Abbott v. Abbott*, 560 U.S. 1, 15 (2010) (quoting *Sumitomo Shoji Am., Inc. v. Avagliano*, 457 U.S. 176, 185 (1982)).

[37] *See Tsai-Yi Yang v. Fu-Chiang Tsui*, 499 F.3d 259, 279 (3d Cir. 2007) (adopting State Department's "undue influence" rule); *de Silva v. Pitts*, 481 F.3d 1279, 1286 (10th Cir. 2007) (same); *see also Vasconcelos v. Batista*, 512 F. App'x 403, 405-06 (5th Cir. 2013) (applying "undue influence" rule).

[38] *See Abbott*, 560 U.S. at 10 (quoting *Medellín v. Texas*, 552 U.S. 491, 506 (2008)).

"objects" to being returned. A preference is not an objection.[39] This is not a matter of magic words or talismanic language. There is a substantive difference between preferring to live in one of two countries—when living in either country would be acceptable—and affirmatively objecting to returning to one country—when living in that country would be unacceptable. Only an objection is sufficient to trump the Convention's strong presumption in favor of return.

This interpretation is consistent with our previous recognition that "the 'age and maturity' exception is to be applied narrowly"[40] and the guidance of the Pérez-Vera Explanatory Report—which warns that exceptions to "the rule concerning the return of the child must be applied only so far as they go and no further . . . if the Convention is not to become a dead letter."[41] It is also consistent with the views of several other contracting states. As with the interpretation of any treaty, "[t]he 'opinions of our sister signatories' . . . are 'entitled to considerable weight'" when interpreting the Convention.[42] "The principle applies with special force here, for Congress has directed that

---

[39] *See, e.g.*, *Garcia v. Pinelo*, 808 F.3d 1158, 1169 (7th Cir. 2015) (assuming that child's statement that "he preferred to stay in Chicago" was not an "object[ion] to being returned to Mexico"); *Tsai-Yi Yang*, 499 F.3d at 279 (concluding that child's "generalized desire to remain in Pittsburgh" was insufficient "to invoke the exception"); *Haimdas v. Haimdas*, 720 F. Supp. 2d 183, 208 (E.D.N.Y.), *aff'd*, 401 F. App'x 567 (2d Cir. 2010); *Falk v. Sinclair*, 692 F. Supp. 2d 147, 165 (D. Me. 2010); *Trudrung v. Trudrung*, 686 F. Supp. 2d 570, 578 (M.D.N.C. 2010); *In re Skrodzki*, 642 F. Supp. 2d 108, 118 (E.D.N.Y. 2007); *R.B. v. K.G.*, 993 N.Y.S.2d 869, 886 (Fam. Ct. 2014); *In re S.H.V.*, 434 S.W.3d 792, 801 (Tex. Ct. App. 2014) ("A reasonable interpretation of the psychological report about S.H.V. is that he preferred the United States over Panama because he perceived the United States to offer better educational and social opportunities, but he did not find life in Panama intolerable or even unpleasant.").

[40] *England v. England*, 234 F.3d 268, 272 (5th Cir. 2000). Several courts have also held that "[a] court must apply a stricter standard in considering a child's wishes when"—as here—"those wishes are the sole reason underlying a repatriation decision and not part of some broader analysis." *de Silva*, 481 F.3d at 1286; *accord Tsai-Yi Yang*, 499 F.3d at 278; *Blondin v. Dubois*, 238 F.3d 153, 166 (2d Cir. 2001).

[41] *Explanatory Report: Hague Convention on Private International Law, supra*, ¶ 34.

[42] *Abbott*, 560 U.S. at 16 (alterations in original) (quoting *El Al Isr. Airlines, Ltd. v. Tsui Yuan Tseng*, 525 U.S. 155, 176 (1999)).

'uniform international interpretation of the Convention' is part of the Convention's framework."[43]    Though not exhaustive,[44] as we review the international case law, courts in Argentina,[45] Australia,[46] Austria,[47] Belgium,[48] Canada,[49] England,[50] France,[51] New Zealand,[52] Northern Ireland,[53] and Switzerland[54] have concluded that a preference to remain in the state of refuge is insufficient to trigger the age and maturity exception.  Indeed, it appears that only courts in Scotland[55] have adopted a broader test.  We are not persuaded by this singular variation in a fabric woven to be of one piece.

---

[43] *Id.* (quoting 22 U.S.C. § 9001(b)(3)(B)).

[44] The Hague Conference on Private International Law maintains a database of decisions concerning the Convention "to promote mutual understanding, consistent interpretation and thereby the effective operation of the . . . Convention." *International Child Abduction Database (INCADAT)*, Hague Conference on Private International Law, http://www.incadat.com.  Most of the cited decisions—and accompanying translations—were located using this database.

[45] Corte Suprema de Justicia de la Nación [CSJN] [National Supreme Court of Justice], 22/8/2012, "G., P. C. c/ H., S. M. s/ reintegro de hijo."

[46] *Richards & Director-General, Department of Child Safety* [2007] FamCA 65.  Australia has passed a regulation that sets the applicable standard.  Under this regulation, the age and maturity exception applies only if "the child's objection shows a strength of feeling beyond the mere expression of a preference or of ordinary wishes." *Family Law (Child Abduction Convention) Regulations 1986* (Cth) reg 16(3)(c)(ii).

[47] Oberster Gerichtshof [OGH] [Supreme Court] Oct. 8, 2003, 9 Ob 102/03w.

[48] Tribunal de Première Instance [Civ.] [Tribunal of First Instance] Bruxelles, May 27, 2003, 02/7742/A.

[49] Crnkovich v. Hortensius, 2008 CarswellOnt 6951 (Can. Ont. Sup. Ct. J.) (WL) ("The objection . . . must be something stronger than a mere expression of preference.").

[50] In re M et al. (Abduction: Child's Objections) [2015] EWCA (Civ) 26, 2015 WL 55897 ("[T]he child's views have to amount to objections before they can give rise to an article 13 exception.  This is what the plain words of the Convention say.  Anything less than an objection will therefore not do.").

[51] Cour d'appel [CA] [regional court of appeal] Grenoble, civ., Mar. 29, 2000, 00/00797.

[52] *Damiano v. Damiano* [1993] NZFLR 548 (FC) ("The first requirement is clearly that there is an objection on the part of a child.  Preference is not sufficient.  There must be a quite emphatic reluctance that extends to the unacceptable.").

[53] RA v. DA [2012] NIFam 9, 2012 WL 6151752 ("The objection of the child must be more than a mere preference expressed by the subject child.").

[54] Tribunal fédérale [TF] Dec. 4, 2007, 5A_582/2007.

[55] Urness v. Minto (1994) SC 249, 265, 1993 WL 966242 ("In our opinion counsel for the petitioner have sought to read the word 'objects' in art. 13 too narrowly . . . . If John

No. 15-40048

This legal conclusion, however, does not resolve whether the age and maturity exception applies in this case. The district court may have framed its questions during the private colloquy in terms of whether A.S.F.S. *preferred* to live in the United States—as opposed to whether she *objected* to returning to Mexico—but its written findings are more ambiguous. In its order, the district court found that it was "appropriate to take into account A.S.F.S.'s views" because she "exhibited strong cognitive and social abilities, and clearly expressed a desire to remain with [Salgado] in the United States." The court also noted that A.S.F.S.'s testimony "that she would be happier remaining in the United States because she would have greater educational opportunities, and the ability to learn more languages" "[f]urther confirm[ed] her maturity." Although these findings adequately explain why A.S.F.S. is mature enough to object, they only hint at whether she did object and, if so, for what reasons. Rather than speculate, we vacate this portion of the district court's order and remand to allow the court to reassess whether Salgado has met her burden in light of the legal principles established by this decision. On remand, the district court is ordered to engage in a new colloquy with A.S.F.S. and enter more detailed findings regarding its eventual conclusion.

IV.

For the reasons stated above, we REVERSE in part, VACATE in part, and REMAND for further proceedings consistent with this opinion.

---

prefers to be with his mother and close family who live in Scotland, the corollary is that he does not wish to be in the United States of America . . . .").

17