RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 26a0178p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

BISMARK BOA-BONSU,

                *Petitioner-Appellant*,

    *v.*

DEBORAH OWUSU,

                *Respondent-Appellee*.

No. 25-3862

───────────────

Appeal from the United States District Court for the Southern District of Ohio at Columbus.
No. 2:25-cv-00632—Algenon L. Marbley, District Judge.

Decided and Filed:  June 22, 2026

Before:  MOORE, CLAY, and NALBANDIAN, Circuit Judges.

───────────────

### COUNSEL

**ON BRIEF:**  Karey E. Werner, Andrew D. Fleming, VORYS, SATER, SEYMOUR, AND PEASE, LLP, Cleveland, Ohio, for Appellant.  Deborah Owusu, Columbus, Ohio, pro se.

MOORE, J., delivered the opinion of the court in which CLAY, J., concurred. NALBANDIAN, J. (pp. 19–22), delivered a separate dissenting opinion.

───────────────

### OPINION

───────────────

KAREN NELSON MOORE, Circuit Judge.  "Under the Hague Convention on the Civil Aspects of International Child Abduction, if a court finds that a child was wrongfully removed from the child's country of habitual residence, the court ordinarily must order the child's return." *Golan v. Saada*, 596 U.S. 666, 669 (2022) (citation omitted).  "There are, however, exceptions to

that rule." *Id.* This case deals with one, the age and maturity exception, under which a court may "refuse to order the return of the child if it finds that the child objects to being returned and has attained an age and degree of maturity at which it is appropriate to take account of its views." Hague Convention on the Civil Aspects of International Child Abduction, Art. 13, Oct. 25, 1980, T.I.A.S. No. 670, 1343 U.N.T.S. 89 (hereinafter "Hague Convention" or "Convention").

Deborah Owusu removed her son B.B. from Finland in violation of her ex-husband Bismark Boa-Bonsu's custody rights; she eventually settled in Columbus, Ohio. Boa-Bonsu then filed a petition in federal court seeking B.B.'s return to Finland. After a two-day hearing, which included an *in-camera* interview of B.B., the district court denied Boa-Bonsu's petition on the ground that the age and maturity exception applied. Seeing no clear error in this determination, we AFFIRM.

## I.  BACKGROUND

### A.  The Hague Convention

The Hague Convention embodies the aim of its signatories "to secure the prompt return of children wrongfully removed to . . . any Contracting State" and also "to ensure that rights of custody and of access under the law of one Contracting State are effectively respected in the other Contracting States." Hague Convention, Art. 1. A wrongful removal under the Convention is one "in breach of rights of custody attributed to a person . . . under the law of the State in which the child was habitually resident," so long as "at the time of removal [custody] rights were actually exercised." *Id.*, Art. 3(a)–(b).

The Convention contains several exceptions. Under Article 12, if proceedings to return the child are commenced more than one year after the wrongful removal, a demonstration that "the child is now settled in its new environment" may defeat return. *Id.*, Art. 12. Under Article 13(a), return may be denied if the parent seeking return (1) was not "actually exercising" custody rights or (2) "consented to" the child's removal. *Id.*, Art. 13(a). Article 13(b) allows an authority to refuse return where "there is a grave risk that [the child's] return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation."

*Id.* The age and maturity exception, which is the subject of this appeal, lives below Article 13's lettered subsections. *See id.*, Art. 13.

The International Child Abduction Remedies Act ("ICARA") lays out the procedures for enforcing the Convention under federal law. *See* 22 U.S.C. §§ 9001–11. Under ICARA, a person seeking return of a child must file a petition in the federal district court with jurisdiction where the child is located. *Id.* § 9003(b). The petitioner then bears the burden of establishing the child's wrongful removal by a preponderance of the evidence. *Id.* § 9003(e)(1)(A). Once wrongful removal is established, the burden shifts to the respondent to demonstrate, also by a preponderance of the evidence, that an Article 12 or 13 exception to return applies. *Id.* § 9003(e)(2)(B).[1]

## B. Factual Background

Boa-Bonsu and Owusu are parents of B.B., who was born in Finland in 2016 and was eight years old at the time of the district court's decision in this case. R. 1 (Compl. ¶ 8) (Page ID #3); R. 24 (Ans. ¶ 8) (Page ID #206); R. 7-2 (Passport) (Page ID #122). Married at the time of B.B.'s birth, the parents divorced in 2019. R. 1 (Compl ¶ 9) (Page ID #3); R. 24 (Ans. ¶ 9) (Page ID #206). B.B. resided in Finland until his removal to the United States. R. 1. (Compl. ¶ 11) (Page ID #3); R. 24 (Ans. ¶ 11) (Page ID #206).

B.B.'s parents separated in 2018 when Owusu left their home for a shelter, claiming that Boa-Bonsu "assaulted" and "sexually abuse[d]" her, allegations that Boa-Bonsu denies. R. 51 (Tr. Vol. 1 at 122, 170) (Page ID #587, 635). Owusu testified that she felt unsafe around Boa-Bonsu, and that the abuse was related to his drinking. *Id.* at 170 (Page ID #635). She did not initially bring B.B. with her to the shelter, but eventually B.B. and his half-brother Burnette joined her there. *Id.* at 92, 183–84 (Page ID #557, 648–49).[2] While Owusu lived at the shelter, Boa-Bonsu visited for parenting appointments with the children. *Id.* at 93 (Page ID #558).

---

[1]The Article 13(b) exception for grave risk, which is not at issue in this appeal, must be demonstrated by clear and convincing evidence as opposed to a mere preponderance. 22 U.S.C. § 9003(e)(2)(A).

[2]Burnette is frequently referred to in the record as B.B.'s "stepbrother." *See* R. 62 (Op. & Order at 21) (Page ID #1164). Because Burnette is Boa-Bonsu's biological son, we use the technically correct term "half-brother." *See* R. 51 (Tr. Vol. 1 at 92) (Page ID #557).

The parties eventually divorced and entered into a child custody agreement under Finnish law. The agreement gave the parents joint custody and provided that B.B. would reside with Boa-Bonsu every other weekend. *See* R. 1-5 (Custody Agreement) (Page ID #60–62). According to Boa-Bonsu, his visitation with B.B. was consistent "[i]n the beginning," but "later it became [a] problem for us." R. 51 (Tr. Vol. 1 at 102) (Page ID #567). The parties disagree as to whether his diminishing visitations were the result of Boa-Bonsu's noncompliance with the custody agreement or Owusu's resistance to his visitation rights. *See id.* at 53–54, 191 (Page ID #518–19, 656). In 2020, Boa-Bonsu went to court to enforce his rights under the agreement, and the parties worked with a mediator. *Id.* at 54–56 (Page ID #519–21). Boa-Bonsu continued to visit B.B. at least occasionally and bought him a cellphone, which Boa-Bonsu used to communicate with B.B. by call and text. *Id.* at 58 (Page ID #523).

The parents' joint custody remained a challenge, and in March 2024 Boa-Bonsu sought the assistance of Finnish social welfare services in ensuring Owusu's compliance with the custody agreement. *Id.* at 65–66 (Page ID #530–31). The Finnish agency scheduled a meeting with Boa-Bonsu and Owusu for June 10, 2024. *Id.* at 71 (Page ID #536). Though she knew about the meeting, Owusu left Finland with B.B. and was in Mexico when June 10 arrived. R. 52 (Tr. Vol. 2 at 257) (Page ID #722). After crossing the border to the United States, Owusu travelled with B.B. to Virginia before moving to Columbus and moving into an apartment with her uncle. *Id.* at 233–34 (Page ID #698–99). After arriving in Columbus, Owusu became pregnant by and engaged to Charles Prempeh, with whom she had been in contact prior to leaving Finland. *Id.* at 234–35 (Page ID #699–700).

B.B.'s half-brother Burnette, who remains in Finland, was deposed virtually prior to the district court's hearing. Burnette testified that he lived with both Owusu and Boa-Bonsu after the two separated but ended up living with his father before he moved into his own apartment. R. 48 (Burnette Dep. at 6–7) (Page ID #356–57). Burnette said that the couple frequently argued but he "never" saw "physical fighting," and he denied that Boa-Bonsu ever abused either him or B.B. *Id.* Burnette also testified about B.B.'s visits to his father's house, saying it was a safe environment with food, water, and entertainment. *Id.* at 8–9 (Page ID #358–59). Burnette said that Boa-Bonsu sometimes left B.B. in Burnette's care during visits so Boa-Bonsu could go to a

friend's house to drink, returning home around 9 p.m. after B.B. had gone to bed. *Id.* at 12–14 (Page ID #362–64).

B.B. testified twice, once in a pre-trial deposition and once before the district court *in camera*. In his August 1, 2025 deposition, he confirmed he understood the difference between telling the truth and lying. R. 47 (B.B. Dep. at 6–7) (Page ID #291–92). B.B. recalled living in Finland, where he participated in normal childhood activities and had dozens of friends. *Id.* at 11–12 (Page ID #296–97). A third-grader in the fall of 2025, B.B. said that he didn't remember the Finnish language and didn't want to return because he would have to restart kindergarten, but he denied there being any other reasons he did not want to return. *Id.* at 13 (Page ID #298). He remembered liking his half-brother Burnette and said he missed him. *Id.* at 15–16 (Page ID #300–01). B.B.'s antipathy towards Finland and Boa-Bonsu appeared to center on an incident when he was six years old, during which Boa-Bonsu broke Owusu's car window and B.B. "had to call the police." *Id.* at 22–23 (Page ID #307–08). B.B. described coming to the U.S. from Mexico after two days there but, seemed not to understand what "crossing the border" meant. *Id.* at 26–27 (Page ID #311–12). He said the journey involved coming "from the jungle," which was "pretty wet and pretty sharp," to California. *Id.* at 27 (Page ID #312). He referred to the phone Boa-Bonsu bought him as a "tracking phone," and said he didn't bring it to the United States because he was scared "strangers or robbers could" find him, and that his mother told him not to bring it with him. *Id.* at 30 (Page ID #315). B.B. also mentioned that he had a new phone he used, but that his mother had blocked his father's number. *Id.* at 32–33 (Page ID #317–18). He said that in the United States his mother sometimes left him alone at home for several hours while she went to work. *Id.* at 34–35 (Page ID #319–20). B.B. didn't remember talking to his father since 2022 and said he didn't have a chance to tell him he was leaving Finland. *Id.* at 37–38 (Page ID #322–23). Asked whether he wished Boa-Bonsu lived in Ohio with them, B.B. said no because he thought Boa-Bonsu was "kind of a bully to [his] mom." *Id.* at 39 (Page ID #324).

After a break in the deposition, B.B. said he'd talked to his mother but, in their conversation, she did not tell him what to say and only urged him to tell the truth. *Id.* at 41–42 (Page ID #326–27). On re-examination by his father's lawyer, however, he admitted that they "talked about [his] father and some other stuff," including reasons he was "scared of" his father.

*Id.* at 46–47 (Page ID #331–32). B.B. explained that he had not mentioned those concerns earlier because he "was scared to say it." *Id.* at 48 (Page ID #333). His mother had told him to explain the additional concerns about his father, but "only said [he] should say what [he] also know[s]." *Id.* He also admitted that he had given a thumbs-up to Owusu during the deposition, saying "she looked pretty mad," and that he wanted his mother's approval of his answers. *Id.* at 48–49 (Page ID #333–34).

B.B. also testified during an *in-camera* interview held during the district court's August 12, 2025 hearing. Asked about time spent at his father's house, B.B. said that "[i]t wasn't a good time" because his half-brother "was actually the one who took care of [him]." R. 53 (B.B. Interview at 6) (Page ID #759). B.B. talked about things he enjoyed doing both in Finland and in Ohio. *Id.* at 7–11 (Page ID #760–64). Asked about going back to Finland, B.B. said: "I do not want to go back. I don't even know how to speak Finnish anymore." *Id.* at 11 (Page ID #764). Asked about his reasons for not going back he mentioned two: not wanting to restart his education at the kindergarten level and not wanting his future sibling to be lonely without him. *Id.* Later, B.B. added that he "fe[lt] . . . pretty bad things" about going back to Finland because he didn't think his father would "take care of [him]" if "he's been alcoholic." *Id.* at 14–15 (Page ID #767–68). B.B. denied that anyone had told him to give a particular answer about whether he wanted to return to Finland, *id.* at 14 (Page ID #767), and he asserted that "[e]verything" he had said was "the truth," *id.* at 15 (Page ID #768).

## C. Procedural Background

Boa-Bonsu filed his petition for B.B.'s return in the district court on June 6, 2025. R. 1 (Page ID #1–10). The district court held a two-day hearing on Boa-Bonsu's petition on August 11 and 12, 2025, during which both parents testified and the *in-camera* interview of B.B. was conducted. R. 51 (Tr. Vol. I) (Page ID #466–665); R. 52 (Tr. Vol. II) (Page ID #666–753); R. 53 (B.B. Interview) (Page ID #754–70). Two months later, after post-trial briefing, the district court issued an opinion denying Boa-Bonsu's petition. R. 62 (Op. & Order) (Page ID #1144–65).

The district court first determined that Boa-Bonsu had demonstrated that Owusu wrongfully removed B.B. from Finland. *Id.* at 6–11 (Page ID #1149–54). It found that Finland,

where B.B. had spent his entire life prior to his removal, was his habitual residence. *Id.* at 6 (Page ID #1149). As for Boa-Bonsu's custody rights, the district court found that the Finnish custody agreement granted him rights to shared custody of B.B. *Id.* at 8 (Page ID #1151). Though Owusu had testified that the agreement was superseded, there was no "subsequent custody agreement or other evidentiary support for this claim." *Id.* Finally, the court found that Boa-Bonsu had exercised his custody rights under the agreement. *Id.* at 8–11 (Page ID #1151–54). Notwithstanding doubts "about the consistency and quality of [Boa-Bonsu's] involvement" in B.B.'s custody and care, Boa-Bonsu's actions still met the relatively low threshold for exercise of rights, which demands only "'attempt[s] to maintain a somewhat regular relationship with the child.'" *Id.* at 9–10 (Page ID #1152–53) (quoting *Friedrich v. Friedrich*, 78 F.3d 1060, 1066 (6th Cir. 1996)).

The district court then turned to Owusu's Article 12 and 13 affirmative defenses, finding first that Boa-Bonsu had not consented to B.B.'s removal. *Id.* at 12–13 (Page ID #1155–56). Here, the district court relied primarily on Owusu's own admission that she removed B.B. from Finland without notifying Boa-Bonsu. *Id.* The district court also rejected Owusu's grave-risk-of-harm defense, noting that this defense requires a showing of "serious abuse or neglect, or extraordinary emotional dependence, when the court in the country of habitual residence . . . may be incapable or unwilling to give the child adequate protection." *Id.* at 14 (Page ID #1157) (quoting *Friedrich*, 78 F.3d at 1069). Assuming the truth of Owusu's allegations that Boa-Bonsu abused her throughout their relationship, the district court found that the "incidents," which were sporadic and did not involve direct harm to B.B., "d[id] not rise to the level of a viable defense" under the Convention. *Id.* at 15–16 (Page ID #1158–59).

Last, the district court addressed the age and maturity exception. Reflecting on B.B.'s *in-camera* interview, the court described B.B. as "attentive[,] well-behaved, observant, and articulate," finding that the child had "meaningfully engaged with the questions posed," "confirmed the importance of telling the truth," and "stated that everything he said was the truth." *Id.* at 18–19 (Page ID #1161–62). The court "conclude[d] that B.B. [was] sufficiently mature for his views to be considered under Article 13 of the Convention." *Id.* at 19 (Page ID #1162). Recognizing the distinction "between the 'wishes' of a child and a child's objection,"

the court found that B.B. "expressed a clear objection to returning to Finland" on three particularized grounds:  (1) "he no longer speaks Finnish and would be embarrassed in school for having to start over in kindergarten"; (2) "his mom is pregnant, and he has a sibling"; and (3) he has "concerns about not being taken care of by his father" based on his belief that his father was an "alcoholic." *Id.* at 19–20 (Page ID #1162–63).

The district court considered whether B.B.'s objections might be the result of "undue influence" by Owusu, which would "undermine the credibility of the child's objections." *Id.* at 20 (Page ID #1163).  Rejecting Boa-Bonsu's arguments along this line, the court found that the evidence of coaching by his mother was weak and that inconsistencies between B.B.'s deposition and *in-camera* interview were "not as stark or dispositive as [Boa-Bonsu] assert[ed]." *Id.* at 21 (Page ID #1164).  Having found that the age and maturity exception applied and B.B. objected to his return to Finland, the district court exercised its authority under the Convention to deny Boa-Bonsu's petition. *Id.* at 22 (Page ID #1165).

## II.  STANDARD OF REVIEW

In Hague Convention cases, we review a district court's findings of fact for clear error and its legal conclusions de novo. *Simcox v. Simcox*, 511 F.3d 594, 601 (6th Cir. 2007). "Whether a child is mature enough to have its views considered is a factual finding, and as such, the district court is entitled to deference." *Id.* at 604.  So too is a district court's determination that a mature child objects to his or her return.  Though at some level a "mixed question" of law and fact, "[o]nce the trial court correctly identifies the governing [legal] standard, what remains . . . is to answer a factual question." *Monasky v. Taglieri*, 589 U.S. 68, 84 (2020); *see also Vasconcelos v. Batista*, 512 F. App'x 403, 407 (5th Cir. 2013) ("[T]he district court's finding that [the child] objected is subject to clear error review."); *De Silva v. Pitts*, 481 F.3d 1279, 1287 (10th Cir. 2007) (noting the "fact-intensive and idiosyncratic nature of [this] inquiry"). Application of the age and maturity exception, therefore, presents "a task for factfinding courts, not appellate courts, and should be judged on appeal by a clear-error review standard." *Monasky*, 589 U.S. at 84.

Clear-error review places "a serious thumb on the scale for the [district] court." *U.S. Bank N.A. v. Village at Lakeridge, LLC*, 583 U.S. 387, 394 (2018). We must therefore "defer to the district court's finding . . . 'even if we would have made the opposite finding,' so long as [its] stor[y] [is] plausible on the record as a whole." *United States v. Estrada-Gonzalez*, 32 F.4th 607, 614 (6th Cir. 2022) (citation modified) (quoting *United States v. Caston*, 851 F. App'x 557, 560 (6th Cir. 2021)). Such review makes good sense in the Hague Convention context because it "speeds up appeals and thus serves the Convention's premium on expedition." *Monasky*, 589 U.S. at 84. Clear error review in this context must also incorporate the recognition that the district court stands in a unique position to assess witnesses' demeanor and credibility. *See, e.g.*, *Matthews v. Abramajtys*, 319 F.3d 780, 788 (6th Cir. 2003); *Wooldridge v. Marlene Indus. Corp.*, 875 F.2d 540, 543 (6th Cir. 1989). Its advantage in this respect is heightened even further when the witness is a minor child whose answers may not come across as clearly in a court reporter's transcript. *See Simcox*, 511 F.3d at 604 ("The district court was obviously in a much better position to judge the child's maturity than are we."); *De Silva*, 481 F.3d at 1287 ("We are also mindful of the magistrate judge's opportunity to observe [the child] in person, and we accord great deference to the court's findings based on that experience.").

## III. ANALYSIS

Although many issues were presented to and decided by the district court, the only one before us is whether the district court erroneously applied the age and maturity exception. *See* D. 12 (Appellant Br. at 13–30); D. 21 (Appellee Br. at 11–15). As detailed in the Convention's official report, the exception "provides that the child's views concerning the essential question of its return or retention may be conclusive, provided it has, according to the competent authorities, attained an age and degree of maturity sufficient for its views to be taken into account." Elisa Pérez-Vera, Explanatory Report ("Pérez-Vera Report") ¶ 30, in *3 Actes et Documents de la Quatorzième session*, 426–76 (1982). We have noted, however, that the Article 12 and 13 exceptions are "narrow" and "are not a basis for avoiding return of a child merely because an American court believes it can better or more quickly resolve a dispute." *Friedrich*, 78 F. 3d at 1067 (quoting 22 U.S.C. § 9001(a)(4)). And a district "court retains . . . the discretion to return a child, despite the existence of a defense, if return would further the aims of the Convention." *Id.*

## A. Maturity

We start with the question of whether B.B., who was a few months shy of nine years at the time of the district court's interview, "ha[d] attained an age and degree of maturity at which it is appropriate to take account of [his] views." Hague Convention, Art. 13. "[G]iven the fact-intensive and idiosyncratic nature of the inquiry, decisions applying the age and maturity exception are understandably disparate." *Simcox*, 511 F.3d at 604 (quoting *De Silva*, 481 F.3d at 1287). We do not hesitate in saying that a fifteen-year-old will usually be sufficiently mature, and a fifteen-month-old will not. *Custodio v. Samillan*, 842 F.3d 1084, 1092 (8th Cir. 2016) (fifteen-year-old child "undisputedly mature"). Things, however, become fuzzier, and a district court's careful assessment more important, near the middle of that age range. Some cases have found that children close in age to B.B. possessed sufficient maturity. *See Jimenéz Blancarte v. Ponce Santamaria*, No. 19-13189, 2020 WL 38932 at *1, 6–7 (E.D. Mich. Jan. 3, 2020) (ten-year-old); *Anderson v. Acree*, 250 F. Supp. 2d 876, 883 (S.D. Ohio 2002) (eight-year-old); *Blondin v. Dubois*, 238 F.3d 153, 167–68 (2d Cir. 2001) (eight-year-old); *cf. Raijmakers-Eghaghe v. Haro*, 131 F. Supp. 2d 953, 957–58 (E.D. Mich. 2001) (ordering discovery to determine whether eight-year-old is sufficiently mature). Others have not. *Simcox*, 511 F.3d at 604; *In re R.V.B.*, 29 F. Supp. 3d 243, 259–60 (E.D.N.Y. 2014).

The inquiry, however, must focus on the facts of the individual case because there is no age cutoff below which a child may not, as a matter of law, be considered mature. The Convention's report notes that "all efforts to agree on a minimum age at which the views of the child could be taken into account failed," so the Convention "leave[s] the application of this clause to the discretion of the competent authorities." Pérez-Vera Report ¶ 30. Decisions interpreting the Convention have likewise rejected the application of any minimum age threshold. *See Tsai-Yi Yang v. Fu-Chiang Tsui*, 499 F.3d 259, 279 (3d Cir. 2007) ("The Convention does not set an age at which a child is automatically considered to be sufficiently mature, rather the determination is to be made on a case-by-case basis."); *Vieira v. De Souza*, 22 F.4th 304, 312 (1st Cir. 2022) (casting doubt on notion that "seven-year-old may never be mature enough to express an opinion"); *Blondin*, 238 F.3d at 167 (rejecting argument that no "eight-

year-old is old enough for its views to be considered"); *see also Simcox*, 511 F.3d at 604 (recognizing that "other eight-year-olds have been found sufficiently mature").

Absent a rule precluding a finding of maturity based solely on B.B.'s age, the district court's finding that he was sufficiently mature was not clear error. The district court, which interviewed B.B. *in camera¸* observed that he was "attentive[,] well-behaved, observant, and articulate," "demonstrat[ing] a quick grasp of the situation once [the] [c]ourt provided context, and meaningfully engag[ing] with the questions posed." R. 62 (Op. & Order at 18–19) (Page ID #1161–62). That first-hand assessment is a far cry from *Simcox*, where the district court found the eight-year-old child "preoccupied, disinterested and detached." 511 F.3d at 604 (quoting *Simcox v. Simcox*, 499 F. Supp. 2d 946, 952 (N.D. Oh. 2007)). Indeed, it looks much more like the cases where similarly-aged children's views *have* been considered. In *Anderson*, for instance, an eight-year-old's ability to "calmly and readily answer[] the court's questions," "understand[] the court's questions," and "understand[] the difference between truth and falsehood" tipped the scales in favor of maturity. 250 F. Supp. 2d at 883. And in *Blondin*, the eight-year-old child was "bright, poised, [and] intelligent," had "an understanding of the purpose of the[] proceedings," and "spoke thoughtfully and expressively about her views on being returned to France." 238 F.3d at 167 (quoting *Blondin v. Dubois*, 78 F. Supp. 2d 283, 296 (S.D.N.Y. 2000)).

Boa-Bonsu disputes the district court's conclusion, arguing that its reference to "various behaviors that this Court has recognized as indicative of a lack of maturity" undermines any finding that B.B. was sufficiently mature to have his views considered. D. 12 (Appellant Br. at 16); *see also* R. 62 (Op. & Order at 18) (Page ID #1161) (noting that Boa-Bonsu "points to B.B.'s reference to Mexico as 'the jungle,' his unfamiliarity with basic concepts such as national borders, his lack of awareness about his mother's engagement, and his confusion regarding why leaving Finland was potentially problematic"). These points are well-taken, and it is obvious from the transcripts that B.B. did not provide the polished testimony one might expect from an adult with English as a first language. At the same time, these elements of B.B.'s testimony do not demonstrate that the district court clearly erred in its maturity finding. For one, the district court was clear-eyed about all aspects of B.B.'s testimony and considered these issues in its

ruling. *See id.* Second, these elements of B.B.'s testimony are orthogonal to the question at the heart of the matter: whether he is mature enough to have an informed view about his return to Finland and to his father. At its core, the age and maturity exception is about "the possibility of [a child's] interpreting [his or her] own interests." Pérez-Vera Report ¶ 30. The depth of a child's cognition and understanding of other issues may certainly have some bearing on this central question, but the appropriate focus is the child's comprehension of the Hague Convention proceedings and its possible outcomes.

Finally, Boa-Bonsu's reference to the fact that B.B. "was fighting to urge to cry" during the *in-camera* interview does not move the needle. D. 12 (Appellant Br. at 16). We are hard-pressed to imagine a scenario more likely to arouse emotion in even the most precocious child and will not reverse the district court's careful consideration of these issues on account of a few tears. The district court, after all, "was obviously in a much better position to judge the child's maturity," *Simcox*, 511 F.3d at 604, and this is not the rare case that merits our reversal of its determination, *see England v. England*, 234 F.3d 268, 272–73 (5th Cir. 2000) (rejecting district court's maturity determination where written findings were extremely limited and evidence showed that child suffered from learning and psychiatric disabilities).

## B. Objection

For the age and maturity exception to apply, a mature minor must "object[]" to his or her return. Hague Convention Art. 13. Recognizing the Convention's animating principle, "that the best interests of the child are well served when decisions regarding custody rights are made in the country of habitual residence," *Abbott v. Abbott*, 560 U.S. 1, 20 (2010), and the Article 12 and 13 exceptions' resulting "narrow[ness]," *Friedrich*, 78 F. 3d at 1067, courts have generally demanded that a child's objection consist of more than a mere preference to remain in the country of removal. In *Tsai-Yi Yang*, for example, the Third Circuit looked to whether the child had made "particularized objections to returning," as opposed to "a more generalized desire to remain." 499 F.3d at 279. The Fifth and Eighth Circuits have likewise drawn a distinction between a child's preference and an objection. *Rodriguez v. Yanez*, 817 F.3d 466, 477–78 (5th Cir. 2016) ("There is a substantive difference between preferring to live in one of two countries . . . and affirmatively objecting to returning to one country."); *Dubikovskyy v. Goun*, 54 F.4th

1042, 1048 (8th Cir. 2022).  The Fifth and Eighth Circuits have also clarified that, as long as the child objects, "the reasons the child objects to being returned are immaterial."  *Dubikovskyy*, 54 F.4th at 1048; *see also Rodriguez*, 817 F.3d at 476 (holding that the mature child exception applies "whatever the reason for the child's objection").  And the Tenth Circuit has affirmed a court's application of the exception where the record evinced a "considered decision on [the child's] part."  *De Silva*, 481 F.3d at 1287.

We agree with these courts and the district court below that the exception demands more than mere preference.  The line between a preference and an objection, however, is fuzzy, and the concepts overlap.  Just as a vegetarian who objects to eating meat would prefer pesto pasta to steak, a child who objects to her return will ipso facto prefer to remain in the country of removal.  All this makes outlining a precise definition of "objection" difficult, but we need not do so here.  We, the district court, and Boa-Bonsu all agree that a meaningful "particularized objection" is sufficient for the exception to apply, so we simply look to whether the district court clearly erred in finding that B.B. expressed particularized objections to his return as opposed to a general preference to remain in the United States.  R. 62 (Op. & Order at 19) (Page ID #1162); D. 12 (Appellant Br. at 17).

The district did not clearly err in its determination here.  As it noted, B.B. "clearly stated that he did not want to go back because he no longer speaks Finnish" and did not want "to start over in kindergarten," "expressed his objection to leaving because his mom is pregnant, and he has a sibling," and objected to his return on the ground that his father would not take care of him, "explain[ing] his concerns were rooted in his father being an 'alcoholic.'"  R. 62 (Op. & Order at 19–20).  Recognizing the district court's careful consideration of the complex issues involved in B.B.'s thought process and "mindful of the [district court's] opportunity to observe [B.B.] in person, . . . we accord great deference to [its] findings" in this regard.  *De Silva*, 481 F.3d at 1287.  Because the record supports the district court's rearticulation of B.B.'s particularized objections, we find no clear error in its determination that B.B. objected to his return.

Disagreeing with the district court, Boa-Bonsu urges us to hold that because "B.B.'s preference to remain in the United States is not based on disdain for Finland," his testimony "simply demonstrates his *preference* for the United States after living here for an extended

period of time." D. 12 (Appellant Br. at 20). But the Convention does not require that B.B. express disdain for Finland as a country. It requires only that the child "object[] to being returned." Hague Convention Art. 13. And the stated reasons for the child's objection are immaterial. *Dubikovskyy*, 54 F.4th at 1048; *Rodriguez*, 817 F.3d at 476. The objection need not, therefore, rest solely on the conditions in the child's country of habitual residence. As the Fifth Circuit has held, because "the age and maturity exception is rooted in the autonomy of the wrongfully removed child" and "the choice between countries is effectively a choice between parents," a child's objection may be grounded in factors including the care they would receive in their country of habitual residence. *Rodriguez*, 817 F.3d at 475–76.

Boa-Bonsu also notes that "B.B.'s reasons for wanting to stay in the United States are based on the natural consequences of [his] abduction." D. 12 (Appellant Br. at 21); *see also id. at* 20 (arguing that B.B.'s loss of the Finnish language and desire to remain in the United States near his unborn sibling are the result of his wrongful removal). We do not disagree, but we fail to see how this impacts the analysis. If B.B. had not been removed from Finland, of course, he could not "object[] to being *returned*." Hague Convention, Art. 13 (emphasis added). Courts must consider any objection to return in the context of a child's wrongful removal and, as we discuss below, should remain wary of any parent's undue influence. Discounting any objection that relates to a child's removal, however, would do more than simply narrow the age and maturity exception—it would reduce it to a nullity.

The dissent sees clear error in the district court's finding that B.B. objected to his return, but relies on a standard that places too much weight on the subject matter of a child's views. In assessing B.B.'s objections, which focused on his education in Finland, family ties in the United States, and concerns about his father's ability to take care of him, the dissent cites cases in which a child's "preference for our country's school system," "desire to remain with new friends," "wish to stay close to siblings or a parent," or "strong preference to remain with one parent because the other is 'often angry'" did not rise to the level of an objection. Dissent at 19 (citing *Tsai-Yi Yang*, 499 F.3d at 279; *Jiménez Blancarte*, 2020 WL 38932, at *7; *Dubikovskyy*, 54 F.4th at 1048–49). Relying on the facts of these cases rather than the Convention's open-ended language and the logic of the decisions interpreting it, the dissent centers the "reasons the child

objects." *Dubikovskyy*, 54 F.4th at 1048. The exception, however, "may apply 'whatever the reason for the child's objection.'" *Id.* (quoting *Rodriguez*, 817 F.3d at 476); *see also Custodio*, 842 F.3d at 1091. That is why, in addition to the cases the dissent relies on, decisions applying the exception have also considered a child's "dislike of his [foreign] school," "specific ties to the United States," and "fear of his father with whom he felt unsafe." *Custodio*, 842 F.3d at 1091; *see also Neumann v. Neumann*, 310 F. Supp. 823, 836 (E.D. Mich. 2018) (finding objection to removal based on "Michigan school" and "support system present in Michigan"). The point is not that a child's views about school, family, or support are irrelevant—it is that they must constitute an *objection*, as opposed to a wish or preference.

The dissent's approach, meanwhile, would narrow the exception's application to extreme cases where, for instance, a child might suffer "*serious* abuse" or "a complete 'lack of supervision'" upon return. Dissent at 20 (quoting *Blondin*, 238 F.3d at 162; *Neumann*, 310 F. Supp. 3d at 836). This construction is out of step with the Convention's text and structure. In both *Blondin* and *Neumann*, the courts denying return relied primarily on the Convention's "grave risk of harm" exception. *Blondin*, 238 F.3d at 158–63; *Neumann*, 310 F. Supp. 3d at 840–41. Winnowing the age and maturity exception to apply only in cases where the substantively restricted "grave risk of harm" exception also applies would render it mere surplusage.

Nor does our approach unduly broaden the age and maturity exception. A district court may not, for instance, engage in an open-ended inquiry into a child's wishes or preferences, as would occur in a state-law custody proceeding. The Convention, moreover, gives a district court discretion to apply the exception even on a finding that a child is sufficiently mature and objects. Hague Convention, Art. 13 (noting that the court "*may* . . . refuse to order return" where the exception applies (emphasis added)). Here, the district court understood the difference between "the 'wishes' of a child and a child's objection," R. 62 (Op. & Order at 19) (quoting *Neumann*, 310 F. Supp. 3d at 835), and our review of the record does not indicate that it erred by miscasting a child's "equivocal" answers and preferences as an objection, *Dubikovvsky*, 54 F.4th at 1049.

## C. Undue Influence

The State Department's contemporaneous legal analysis of the Convention notes that "[a] child's objection to being returned may be accorded little if any weight if the court believes that the child's preference is the product of the abductor parent's undue influence over the child." Hague Convention Text and Legal Analysis, 51 Fed. Reg. 10,494, 10,510 (Mar. 26, 1986). Such considerations were important, the analysis found, because of the "potential for brainwashing of the child by the alleged abductor." *Id.* Federal courts have adhered to this analysis, holding that an objection that "express[es] someone else's opinion," and not the child's unadulterated views, "should not be considered." *Tsai-Yi Yang*, 499 F.3d at 279, 280 n.20; *see also De Silva*, 481 F.3d at 1286 ("[I]f a court determines that the youngster's opinion is the product of undue influence, the child's wishes are not taken into account.").

We clarify at the outset that undue influence is not a standalone factor in the Hague Convention analysis. It is instead best understood as a component of the district court's determination that a child is sufficiently mature and objects to his return. *See Avendano v. Balza*, 985 F.3d 8, 15 (1st Cir. 2021) ("In short, the possibility of undue influence over the child is one consideration in the competent authority's assessment of whether a child is of the age and maturity to have their views considered."). This is because "[t]he Hague Convention is silent on undue influence and instead emphasizes the discretion of the deciding authority in applying the mature child exception." *Id.* The concept of undue influence simply embodies the concern that a child may be insufficiently mature to do anything other than regurgitate a parent's opinion, or that a child may have been otherwise coached to object.

Here, the district court carefully considered Boa-Bonsu's allegations of undue influence but found them insufficient to sway its findings regarding B.B.'s maturity and his objection. R. 62 (Op. & Order at 20–22) (Page ID #1163–65). As for Boa-Bonsu's concerns arising from B.B.'s conversation with his mother during a break in his deposition, the district court found no unambiguous evidence that Owusu had "direct[ed] specific testimony," as opposed to simply encouraging "the child to speak honestly." *Id.* at 20 (Page ID #1163). The district court also addressed inconsistencies between B.B.'s deposition and his *in-camera* interview, including the child's slightly varied descriptions of his father's caregiving. *Id.* at 21 (Page ID #1164).

Accepting that "the evidence reflects some influence by [Owusu]," the district court found that it did "not rise to the level of undue influence that would render B.B.'s objections unreliable." *Id.*

Viewing this question through the deferential lens of clear-error review, we again decline to disturb the finding below. Courts of Appeals have upheld determinations of a lack of undue evidence where, as here, the district court "consider[ed] the evidence cited by [the petitioner] on this issue" and determined that the objection reflected the child's own views. *Avendano*, 985 F.3d at 15; *see also Blondin*, 238 F.3d at 167 (district court need not entirely "rule out the possibility that [child] may have been coached" (citation modified)); *Díaz-Alarcón v. Flández-Marcel*, 944 F.3d 303, 313 (1st Cir. 2019) (finding no clear error where district court rejected undue-influence argument upon determination that child's statements were "honest and heartfelt"); *Custodio*, 842 F.3d at 1091 n.3 (similar). We do not take lightly the possibility of Owusu's interference with B.B.'s testimony, and would advise parties to future Hague Convention proceedings to avoid anything that smacks of an attempt to influence an impressionable child. But we see no evidence that the district court failed to consider these facts in arriving at its decision here. Although the evidence does demonstrate the possibility of influence and that B.B. viewed his mother's approval as important, the record is not so extreme as to render the district court's finding that B.B. was expressing his sincere views "[im]plausible on the record as a whole." *Estrada-Gonzalez*, 32 F.4th at 614.[3]

## IV. CONCLUSION

Hague Convention cases are by nature immensely fraught and unimaginably significant to the families they affect. This one is no exception. Whether B.B. is returned to Finland or not, he faces a future in which he may have limited or no contact with one of his parents. Faced with the unenviable burden of adjudicating Boa-Bonsu's petition, the district court acted

---

[3]In addition to his specific arguments about B.B.'s maturity, whether B.B. objected, and Owusu's undue influence, Boa-Bonsu also argues that the district court should have "recognize[d] that denying Mr. Boa-Bonsu's Petition based solely on B.B.'s objection alone circumvents the purpose of the Hague Convention," and should have more "closely scrutinize[d]" Owusu's invocation of the age and maturity exception. D. 12 (Appellant Br. at 26, 28). We recognize that refusing return based on the exception is not mandatory, but we do not find that the district court ignored the context of this case and thus abused its discretion. Nor does the district court's affirmance run afoul of *Friedrich*, in which we stated that a removing parent may not, in the context of the grave-risk-of-harm exception, simply "complain that the child has grown used to the surroundings to which they were abducted." 78 F.3d at 1068.

expeditiously, applied the law carefully, and arrived at its factual findings after face-to-face contact with both B.B. and his parents. Boa-Bonsu has not advanced any argument that would convince us, with just a cold record, to set aside the decision below. We therefore AFFIRM.

———————————————

**DISSENT**

———————————————

NALBANDIAN, Circuit Judge, dissenting.  I agree with the majority that the district court didn't clearly err with respect to B.B.'s maturity.  But I think the district court clearly erred in finding that B.B. objected.  On my view, he voiced a mere preference to remain in the United States.  And that's not sufficient, so I would've reversed.

It's true that the line between a preference and an objection can be "fuzzy"—that's because a preference requires a comparator.  So a child who prefers to stay in the United States necessarily takes a dimmer view of his former country.  And that can make a strong preference seem like an objection.  But while "an objection to living in [country] A will almost always . . . indicate a preference for living in [country] B," "a preference to live in [country] B does not necessarily indicate an objection to living in [country] A."  *Dubikovskyy v. Goun*, 54 F.4th 1042, 1049 (8th Cir. 2022).  Thus, a court must discern a child's particularized objection to returning to his country of origin from his generalized desire to remain in this one.

The distinction between a preference and an objection is fact-dependent, but the Hague Convention caselaw provides some useful guideposts.  What's typically insufficient?  A preference for our country's school system doesn't cut it.  *Tsai-Yi Yang v. Fu-Chiang Tsui*, 499 F.3d 259, 279 (3d Cir. 2007); *Jimenéz Blancarte v. Ponce Santamaria*, 2020 WL 38932, at \*7 (E.D. Mich. Jan. 3, 2020).  Nor does a desire to remain with new friends.  *Dubikovskyy*, 54 F.4th at 1048–49; *Jimenéz Blancarte*, 2020 WL 38932, at \*7.  Nor a wish to stay close to siblings or a parent.  *Dubikovskyy*, 54 F.4th at 1049; *Tsai-Yi Yang*, 499 F.3d at 279.  Nor even a strong preference to remain with one parent because the other is "often angry."  *Jimenéz Blancarte*, 2020 WL 38932, at \*7.

The standard is high—and for good reason.  "Only an objection is sufficient to trump the Convention's strong presumption in favor of return."  *Rodriguez v. Yanez*, 817 F.3d 466, 477 (5th Cir. 2016).  Otherwise, the mature-child exception would swallow that presumption.  That's why an objection can't simply reflect the invariably painful choice between friends, parents,

school systems, activities, and lifestyles. So in *Blondin v. DuBois*, the district court properly denied repatriation not based on "financial considerations, educational opportunities, the child's preferences, or other such advantages," but on a finding of "*serious* abuse." 238 F.3d 153, 162 (2d Cir. 2001) (emphasis added). And in *Neumann v. Neumann*, though two brothers cited "education and sports practice, training, and games" as reasons to remain in the United States, they also "noted that their father no longer lives in Mexico," so it was "unclear" whether the boys would've even lived with their father upon their return—which would've resulted in a complete "lack of supervision." 310 F. Supp. 3d 823, 836 (E.D. Mich. 2018).[1]

Given this standard, the district court clearly erred in finding that B.B. objected to his return. It cited B.B.'s statement that "he did not want to go back because he no longer speaks Finnish and would be embarrassed . . . for having to start over in kindergarten," his desire to remain with his sibling and pregnant mother, and his "concerns about not being taken care of" by his "alcoholic" father. R.62, Order, PageID 1162–63. But B.B.'s stated reasons don't amount to an objection.

First, the district court erroneously construed B.B.'s preference for this country's school system as an "objection" based on his unfamiliarity with the Finnish language. To be sure, language proficiency can be relevant in other Hague Convention contexts. *See, e.g.*, *Monasky v. Taglieri*, 589 U.S. 68, 77 n.3 (2020) (language proficiency is relevant in determining a child's "habitual residence"); *Bobadilla v. Cordero*, 2014 WL 3869998, at *3–4 (M.D.N.C. Aug. 6, 2014) (considering language proficiency in determining whether the "well-settled" defense to removal applies). But putting aside whether a child can object based on a language barrier, the district court mischaracterized B.B.'s remarks. B.B. voiced dismay at speaking Finnish at a lower grade level—which would require him to restart kindergarten in Finland. In this vein he sought to convey, perhaps a bit hyperbolically, that his Finnish skills had atrophied. The district court took him literally and concluded that B.B. "no longer speaks Finnish."[2] R.62 at PageID

---

[1]The district court heavily relied on this case in finding that B.B. objected to returning to Finland, *see* R.62, Order, PageID 1162, but failed to appreciate the significance of an entirely absent parent in the country of return, which isn't a consideration here.

[2]That conclusion is at odds with Mr. Boa-Bonsu's claim that B.B. "speaks very good Finnish." R.61, Trial Tr., PageID 1040.

1162.  But B.B.'s concern is better understood as a preference to remain in his current grade in the United States.  That is, his complaint is with the school system—not with the language per se—and that's insufficient.  *Tsai-Yi Yang*, 499 F.3d at 279; *Jimenéz Blancarte*, 2020 WL 38932, at *7.[3]

Second, the district court erroneously construed B.B.'s desire to stay with his mother and sibling as an objection.  As the majority put it, Hague Convention cases are "by nature immensely fraught."  But that's because every Hague Convention case involves separated parents and a broken family.  If a child could remain in this country by stating that he would miss a parent or sibling, then the mature-child exception would eviscerate the Convention's presumption against removal.  B.B.'s concerns—understandable as they are—don't suffice under the caselaw.  *Dubikovskyy*, 54 F.4th at 1049; *Tsai-Yi Yang*, 499 F.3d at 279.

And third, the district court erred in finding that B.B. objected based on his father's purported alcoholism.  No doubt, a child's stated fear of abuse can amount to an objection.  *See, e.g.*, *Blondin v. Dubois*, 78 F. Supp. 2d 283, 296 (S.D.N.Y. 2000) (noting "the backdrop of serious physical abuse by the father").  But there's no evidence in the record that Mr. Boa-Bonsu ever physically abused B.B.  *E.g.*, R.62 at PageID 1159 ("[Ms. Owusu] confirmed that [Mr. Boa-Bonsu] never physically abused B.B."); R.48, Burnette Dep., PageID 357 (denying that Mr. Boa-Bonsu ever physically abused B.B).  So instead, the district court styled B.B.'s reference to Mr. Boa-Bonsu's purported alcoholism as a concern that Mr. Boa-Bonsu couldn't adequately take care of him.  R.62 at PageID 1163.  Putting aside the record evidence that Mr. Boa-Bonsu is gainfully employed, claims to abstain from alcohol, and previously drank only socially, R.48 at PageID 362; R.61, Trial Tr., PageID 960, 1028, B.B.'s vague reference to Mr. Boa-Bonsu's purported alcoholism isn't a particularized objection to his abilities as a caregiver and a provider.  *See, e.g.*, *Haimdas v. Haimdas*, 720 F. Supp. 2d 183, 194, 209 (E.D.N.Y. 2010) (child's preference for remaining in the United States, based in part on his mother's excessive alcohol consumption, doesn't amount to a particularized objection); *cf., e.g.*, *Blondin*, 238 F.3d at 162

---

[3]This consideration also risks creating perverse incentives for the parent who wants to kidnap a child.  The longer the parent can keep the child in a new country before any interview and the more isolated that the parent can keep the child from his or her home culture, the more likely it is that the child will "object" to going back.  So it's no surprise here that B.B. is concerned about his Finnish fluency because he's lived in the United States for two years.

(finding serious physical abuse); *Sadoun v. Guigui*, 2016 WL 4444890, at *11 (S.D. Fla. Aug. 22, 2016) (crediting objection based on alcoholism *and* physical abuse).

For these reasons, I respectfully dissent.